**HERRING et al. v. HOUSTON NAT. EXCH. BANK. (No. 8264.)**

(Court of Civil Appeals of Texas. Galveston. March 15, 1922.)

**1. Appeal and error ⬤➔916(1)—Order of filing pleadings which will support the judgment on plea of privilege presumed.**

The record showing that defendants' plea of privilege and answer to the merits were filed on the same day, without showing which was filed first, it will be assumed in support of the judgment overruling the plea that the plea was presented after the filing of the answer, and that the judgment was based on the consequent waiver.

**2. Venue ⬤➔11—Plea of privilege not available where commissioners are sued on their predecessor's contract to pay money in the county of action.**

Where prison commissioners are sued on the contract of their predecessors in office to pay money in the county where action was brought, defendants' plea of privilege to be sued in the county where they individually reside is not available.

**3. States ⬤➔191(2) — Action against prison commissioners on their note against state, so requiring its consent.**

Action against prison commissioners in so far as seeking recovery on their notes given in part payment of property bought by them for the state, and foreclosure of lien on the property purchased is a suit against the state, which cannot, without its consent, be maintain-

ed in its courts; not being one to recover the title and possession of the property sold.

**4. States ☜132—State by general appropriation bill held to have ratified purchase by prison commission and recognized purchase-money notes as its debt.**

The purchase of oil mill properties by the prison commission was ratified by the state, and the purchase-money notes recognized as its debt, where, after the Legislature had investigated and fully understood the purchase, a general appropriation bill was passed which appropriated all the proceeds arising from the operation of the prison system to payment of the operating expenses thereof, with provision that out of such proceeds there should also be paid all other debts of the commission for which no specific appropriation had been made; and this, too, after amendment providing that no payment should be made on such notes was eliminated.

**5. States ☜132—Appropriation for penitentiary system held to allow only surplus to be used for old debts.**

By General Appropriations Act 37th Leg. (1921) c. 53. appropriating all the proceeds arising from operation of the penitentiary system for the maintenance and support thereof, and providing that out of said fund shall also be paid any indebtedness of said system not provided for by specific appropriation, it was intended that so much of said income as was necessary for support and maintenance of the system should be used before the other debts were paid.

**6. Injunction ☜10—Enjoining act not contemplated improper.**

The prison commission is improperly enjoined from pledging the income of the prison system for a loan, the undisputed evidence being that they not only had been advised that they could not do so, but that none of the members contemplated doing it.

**7. Mandamus ☜141 — Prison commissioners not "officers of an executive department" of the state within statute as to court empowered to issue mandamus.**

Within Rev. St. art. 5732, limiting to the Supreme Court power · to issue mandamus against any of the "officers of the executive department of the * * * state," the prison commissioners are not officers of any such department, but constitute an official board only.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Officer.]

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Suit by the Houston National Exchange Bank against J. S. Herring and others. From judgment granting injunction, defendants appeal. Reversed and rendered.

Hill & Hill, of Houston, for appellants.

W. A. Keeling, Atty. Gen., and W. W. Caves and Tom L. Beauchamp, Asst. Attys. Gen., for appellee.

LANE, J. This suit was brought by appellee, Houston National Exchange Bank, against J. A. Herring, Sanford Dean, and Walter Sayles, in their capacity as penitentiary commissioners of the state of Texas, to recover upon three certain promissory notes, each for the sum of $31,250, and payable at Houston, Tex., theretofore executed by the defendants' predecessors in office, and by them delivered to Ft. Bend Cotton Oil Company in part payment for about three acres of land in Ft. Bend county, Tex., together with all improvements and appurtenances thereto belonging, consisting of a fully equipped oil mill and certain personal property, and for a foreclosure of the lien given upon said property to secure the payment of said notes.

Plaintiff prayed for the issuance of a peremptory writ of mandamus against the defendants, requiring them to pay the amount due on said notes, or so much thereof as might remain unpaid after the proceeds of the sale of the aforesaid property has been applied toward the payment of said debt, and also prayed for the issuance of a writ of injunction restraining the defendants as such commissioners from in any manner pledging or hypothecating the income of the prison system for the years 1921 and 1922 pending this suit, unless and until said debt shall be paid or payment provided therefor out of said income.

The plaintiff alleged the sale of the oil mill properties to the prison board, the execution by said board of the above-mentioned notes, and the execution of a deed of trust upon said property to secure the payment of the same, the transfer of said notes to plaintiff before maturity, and its ownership thereof.

Plaintiff further alleged that the Thirty-Seventh Legislature of the state of Texas passed an act, which was approved on the 2d day of September, 1921 (Acts 37th Leg. 1st Called Sess. c. 53), by which all the proceeds arising from the operation of the prison system of the state of Texas were appropriated to the payment of the expenses necessary to operate said system, and by which it was also provided:

"That out of the proceeds there shall also be paid all other debts of the prison commission for which no specific appropriation has been made."

It alleged that no specific appropriation had been made to pay the debt sued for, and that, by reason of the act of the Thirty-Seventh Legislature above mentioned, it became the mandatory duty of the defendants, as prison commissioners, to pay the indebtedness sued for out of the proceeds arising from the operation of said prison system during the years 1921, 1922, and 1923;

☜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

that defendants, as such commissioners, had ample funds arising from the operation of said prison system for the year 1921 to pay said debt; that said commissioners had failed and refused, and still refuse, to pay the indebtedness sued upon, and that they contemplated borrowing money and pledging the crops and income to arise from the operation of said prison system for the year 1922 to the repayment of such borrowed money, without making any provision for the payment of plaintiff's debt, and that, unless they are restrained from so doing, defendants will pledge such proceeds to the payment of other debts than plaintiff's debt, to its irreparable damage. The prayer was as hereinbefore stated.

On the 28th day of December, 1921, the defendants, as individuals, filed their plea of privilege to be sued in Walker county, Tex., the county of their residence. This plea was in manner and form as required by law, and no contest thereof was filed by the plaintiff, and on the same day—that is, December 28, 1921—and before their plea of privilege was presented to the court, and without making any reference to said plea, the defendants, answering the plaintiff's suit against them as prison commissioners of the state of Texas, demurred generally to the allegations of the plaintiff's petition, upon the grounds that it appears therefrom that plaintiff's suit is a suit against the state of Texas, without permission of the Legislature of said state, and therefore same could not be maintained, and in no event could it be maintained for the purpose of enforcing payment of the notes sued upon, because the prison commissioners had no lawful authority to execute said notes, but, to the contrary, they were specially forbidden by law to either execute or pay them.

Answering to the merits of the plaintiff's suit, the defendants denied, first, that the prison commission has ample funds arising from the operation of the prison during the year 1921 to pay the notes sued on; second, that defendants contemplate borrowing money and pledging the crops and income arising and to arise from the operation of the prison system during the year 1922 to the payment of such borrowed money, either with or without making provision for payment of the notes here sued upon; third, that unless restrained from so doing they will pledge the proceeds arising from the operation of the prison system, either to the payment of indebtedness other than that alleged in plaintiff's petition, or otherwise: fourth, that they contemplate in any manner, or for any purpose pledging or hypothecating the present or future income of the prison system during the years 1921, 1922, or 1923, or for any period of time, for any purpose; fifth, that the alleged purchase of said land, in part payment for which the

notes here sued upon are alleged to have been executed, had been, prior to such alleged purchase, submitted to and approved by the Legislature; sixth, that ~aid alleged notes now constitute, or have ever constituted, a valid and subsisting debt or obligation either against these defendants, or against the board of prison commissioners, or against the state of Texas; seventh, that the payment of these notes has been specifically authorized by the Legislature; and alleging that defendants are expressly precluded by law from paying same, either from the proceeds or income arising from and accruing to the prison system, or otherwise.

Replying to the defendants' answer, the plaintiff filed the following pleading:

"Now comes the plaintiff with leave of the court already had, and files this its trial amendment, and says:

"That the property described in plaintiff's original petition consists almost entirely of machinery used in the establishment and operation of a cotton seed oil mill.

"That, while there is certain land embraced in the purchase from the Ft. Bend Cotton Oil Company in the transaction described in said petition, the land consists only of one town lot 50 feet by 85 feet in size and 1.44 acres of land and 2.59 acres of land, and being the land on which the machinery and buildings constituting the Ft. Bend Cotton Oil Company's mill is situated.

"That the value of the land as compared with the machinery and its appurtenances is negligible, the land having a value of, to wit, not exceeding $250, while the machinery and appurtenances were at the time of said purchase by the prison commission, of the reasonable value of $125,000, and the purchase of the land by the prison commission and the conveyance of same to the prison commission by the Ft. Bend Cotton Oil Company was only incident to the main purpose of said transaction, and that the same was not a purchase of land within the meaning of the law requiring purchases of land to be first approved by the Legislature before purchased by the commission, but was the purchase and establishment of a factory for the use of the prison system and the employment of the convicts thereof, and was authorized and permitted by law without the approval of the Legislature, and that the purchase of said land by the prison commission was and is authorized by law without the approval of the Legislature, and that the prison commission had the right to buy said machinery and the land incident thereto, and to execute the notes herein sued on in part payment thereof."

Facts.

On the 11th day of December, 1920, the prison commissioners of Texas purchased from the Ft. Bend Cotton Oil Company, for the use of the prison system, about three acres of land situated in Richmond, Ft. Bend county, Tex., on which were located the machinery, buildings, and other things, constituting the Ft. Bend Cotton Oil Company's cotton seed oil mill. In part consideration

for said property said prison commissioners in their official capacity executed and delivered to said Oil Mill Company the three notes sued upon in this suit, each dated December 20, 1920, each for the sum of $31,250, payable to the Cotton Oil Company on or before one, two, and three years, respectively, from date, at the office of the Houston National Exchange Bank at Houston, Tex. To secure the payment of said notes said commissioners executed and delivered a deed of trust to one W. P. Winner by which they conveyed the property so purchased to Winner, as trustee for the benefit of said Oil Mill Company. The notes mentioned were transferred to and became the property of the plaintiff, the Houston National Exchange Bank, before maturity, and at the time of the filing of this suit one of said notes was long past due, and none of them had been paid.

The Thirty-Seventh Legislature of Texas, at its First Called Session, appointed a joint committee, consisting of four senators and five members of the house, to investigate the affairs of the prison system of this state, of which committee of the senate Senator Williams was chairman. On the 30th day of July, 1921, this joint committee made its report to both branches of the Legislature, and in said report, among other things, they said:

"We find that the prison commission on or about the 14th day of December, 1920, purchased the Ft. Bend Cotton Oil Mill located at Richmond, Tex., for the sum of $125,000; that they paid the sum of $31,250 cash, and executed notes secured by lien on the mill for the balance."

Again:

"We find that the Attorney General's department advised the prison commission that they could legally purchase the mill. However, we think this question is of such importance to the state as to require judicial determination."

This committee also made the following recommendation:

"We recommend that none of the deferred payments evidenced by the lien notes executed by the prison commission for the Richmond Oil Mill be paid by the prison commission, and that the Attorney General's department bring suit to set aside this purchase."

The report of the committee and the recommendation mentioned was adopted.

On the 4th day of August, 1921, Senate Bill No. 61, known as the General Appropriation Bill, was introduced in the senate, which contained, among other things, substantially the following:

"State Penitentiaries.

"The proceeds of all convict labor on farms and elsewhere, the proceeds of all manufactured products, all farm products, and all other proceeds of the penitentiary system and of all other sources connected therewith, or so much thereof as may be necessary, are hereby appropriated for the maintenance and support of the penitentiary system, including buildings, farms, and improvements, and repairs on same for the year ending August 31, 1922, and August 31, 1923, out of which fund shall also be paid any indebtedness of said system not otherwise provided for by specific appropriation, as well as the expenses attached to conveying convicts to the penitentiaries and farms. Said funds shall be deposited with the State Treasurer. and paid out as provided in articles 6188 and 6192 of the Revised Civil Statutes of 1911."

On the 8th day of August, 1921, Senate. Bill No. 61 being under consideration, Senator Williams, chairman of the Senate Committee to investigate penitentiary affairs, offered an amendment thereto as follows:

"But no money shall be paid by penitentiary commissioners to apply on mule note for $39,-000 and interest made to Bassett Blakely, January 19, 1921, nor any amount of the amount due on Richmond Oil Mill purchase notes."

This amendment was adopted. This bill as. amended was passed by the Senate and sent to the House for consideration. The House amended the bill by striking out the Williams amendment, and as amended passed the same. The Senate refused to pass the bill as amended by the House, and asked for a conference committee, which request was granted, and upon the report of such committee the bill was finally passed eliminating the Williams amendment, and is as hereinbefore set out.

There is nothing in either article 6188 or 6192 mentioned in that part of Senate Bill No. 61, hereinbefore set out, which prohibits the prison commission from drawing from the state treasury the funds deposited by it herein under the provisions of said bill, but, on the contrary it is provided by article 6188 (Vernon's Am. Civ. St. Supp. 1918) that—

"The prison commission is authorized to draw upon the prison commission account with the State Treasurer such sum or sums of money and at such time or times as in their judgment may be necessary for the transactions of the business of the system; provided, they shall not draw for a sum that will give them in hand and in bank, subject to disbursement, a sum in excess of one hundred and seventy-five thousand ($175,000.00) dollars. * * *"

Upon. a preliminary hearing of the plaintiff's prayer for writ of mandamus and injunction, J. A. Herring, chairman of the board of prison commissioners, testified, in substance, that on or about December 28, 1921, the prison commission tried to get a loan of money for the use of the prison system, but that they had no idea of paying any part of the debt of plaintiff at this time;

that if instructed to pay said debt by the court or Legislature they would have no objection to paying it; that this debt would not be paid by the prison board, however, until at the end of a lawsuit; that if they could get the money to run the prison system they would do so, but would not pay the plaintiff's debt until they are compelled to do so.

On cross-examination he testified:

"We desire to obtain money in some way on which to operate the prison system because we have no funds on which to operate it at the present time. We have approximately $19,000. That is all the money we have on hand. We have about $10,000 worth of sugar belonging to the system on hand unsold. That constitutes all unsold products.

"I have been chairman of the board since February, 1921. I am familiar with the approximate monthly cost and expense, or annual cost and expense, of operating the prison system. Exclusive of the purchase of property and the making of any permanent improvements the operating and running expense is around $80,000 per month. In the early part of 1921 it ran a little higher, while in the latter part of the year a little lower. The price of supplies has changed some. The only money we have on hand unexpended is that mentioned, and the only prospect for obtaining any is derived from the proceeds of convict labor set out in the General Appropriation Bill passed by the First Called Session of the Thirty-Seventh Legislature. We expect, as I stated a few minutes ago, and will try to obtain from private parties, or such sources as we can, sufficient funds to enable us to operate the prison system until the proceeds from the operation of the prison system are sufficient to afford funds for that purpose. Since the Legislature adjourned, we have discussed this matter with some parties in an effort to obtain funds with which to operate the penitentiary system, but up to this time we have been unable to perfect any arrangement with any one for that purpose. We expect that it will take about $600,000 to operate the system until such time as our crops will begin to move. We were advised by the Attorney General that we could not pledge or mortgage the crops at all, or any other property belonging to the state, and we have abandoned the idea of doing it. Our efforts to borrow money did not contemplate paying the oil mill notes until that matter has been adjudicated by the courts. In borrowing money we would naturally have to provide some way or discuss some manner in which it could be taken care of. We expect to take care of what we borrow out of the crops we are going to raise. We know, however, that we are not authorized to mortgage or to pledge the crops for that purpose. We expect to find some one who is able and willing to advance sufficient funds to operate the prison system until the proceeds of the system will be sufficient to operate and repay this money. General W. A. Keeling himself advised us verbally on the 21st of December, 1921—that is, about a week ago—that we could not pledge or hypothecate the property or income of the penitentiary system. I did state a moment ago that we have not been able to

perfect any plans for financing the system. Whatever plans may be finally arranged, if it can be arranged at all, will not pledge or hypothecate, or create any lien upon the income or property of the prison system as security for the repayment of the loan. As I understand, we have no authority to do so."

Upon preliminary hearing of the plaintiff's application for mandamus and injunction, the court rendered judgment restraining the prison commission from offering or endeavoring to pledge or hypothecate in any manner the present and future income of the prison system during the years 1921, 1922, and 1923 unless and until they shall pay or provide for the payment out of the proceeds so pledged the debt of the plaintiff, Houston National Exchange Bank, and until the further orders of the court. From this judgment the prison commissioners have appealed.

[1] By the first assignment it is insisted that the court erred in overruling appellants' plea of privilege. The record shows that the plea of privilege was filed on the 28th day of December, 1921, and that the answer of defendants to the merits of the cause was filed on the same day. There is nothing in the record to show which was filed first, the plea of privilege or the answer, and the only evidence that we have that the plea of privilege was filed first is a statement to that effect in appellants' brief. The answer makes no reference to the plea of privilege, as is usual in cases where the plea of privilege has not been disposed of prior to the filing of the answer to the merits. In such case as the present, we think it may be assumed, in support of the judgment upon the plea, that the court overruled the plea because of waiver of the same, in that it was presented to the court after filing answer to the merits of the cause.

[2] However, for a stronger reason than that first mentioned we overrule the contention of appellants. The plea of privilege by J. A. Herring, Sanford Dean, and Walker Sayles, which was sworn to by only two of the defendants, was evidently filed as a plea of the persons named as individuals, and not as a plea of the prison commission. A most potent reason for reaching this conclusion is that the indisputable evidence shows that the prison commission executed the notes sued on, and that it (the commission), composed of three persons, as provided by the Constitution and law of this state, promised in writing to pay the indebtedness sued on at Houston in Harris county, where this suit was brought, and we cannot assume, or even be led to believe, that any of the persons who filed the plea of privilege in this case intended to make oath that the prison commission, a legally constituted board, had not made such written promise. The effect of the plea is that the persons named are, and were at the time stated, residents of Walker coun-

ty, Tex., and not of Harris county, Tex., and that none of them had promised in writing to pay the debt sued upon in Harris county. It will hardly be contended that if the prison commission, by law composed of three members, should contract a legal obligation during the incumbency of one set of members, such obligation would cease to be an obligation of the prison commission upon a change being made in the personnel of said commission, either by appointment or election. So, then, the debt sued upon was at its creation, and still is, one contracted by the prison commission of the state of Texas, and is one which the prison commission contracted in writing to pay in Harris county, and we are unwilling to assume that the affiants to the plea of privilege intended to aver the contrary.

We can by no means of reasoning reach a conclusion that if the Prison Commission, composed of one set of members, are authorized by law to make a contract in writing to pay a certain sum of money at a certain place, and it does make such contract, that another set of members of the same commission who succeed the first in office, can, by their plea of privilege, have a suit brought at the place where the contract was to be performed removed to the county where they individually reside.

[3] We agree with appellants in their contention that so much of the plaintiff's suit as seeks to recover judgment on the notes sued on, with a foreclosure of its alleged lien, is a suit against the state which cannot, without the consent of the state, be maintained in the state courts.

While it is true that, if plaintiff can show that it owns the equitable title and the right of possession, the fact that those wrongfully holding possession are not claiming any interest in the property for themselves, but are holding and claiming for and as agents of the state, would not defeat plaintiff's right to maintain a suit against such wrongful holders to recover title and possession of the property, it is also true that a suit against an officer or agent of the state to enforce the performance of a contract made for the state, or to recover damages for a breach of such contract, while nominally against the officer or agent, is in fact a suit against the state. Imperial Sugar Co. v. Cabell (Tex. Civ. App.) 179 S. W. 83.

The suit of plaintiff is not one for the recovery of the title and possession of the property sold, but is one to enforce payment of certain notes executed by officers and agents of the state, in part payment of property purchased by them for the state.

The case of Imperial Sugar Co. v. Cabell, above cited, and authorities therein cited, are authorities for a holding that appellee's suit, in so far as it seeks a recovery upon the notes sued upon and a foreclosure of its lien on the property purchased is a suit against the state. We think the decision in the case cited is decisive of the question last discussed, and we therefore rest our decision of this question upon the law governing such cases, as there declared, and hold that appellee's suit to enforce payment of the notes sued upon and for a foreclosure of its lien cannot be maintained.

[4] In deciding the question raised by the contention last mentioned, we will not enter into the discussion invited by appellant as to whether the prison commission had authority to purchase the oil mill properties and execute in part payment therefor, the notes sued upon, so as to make them obligations of the state, as it is shown that, after the purchase of said properties and the execution of said notes, and after an investigation of this purchase had been made and fully understood by the Legislature of this state, it ratified such purchase and recognized said notes as a debt against the state by making an appropriation to pay same, in that on the 2d day of September, 1921, it passed the General Appropriation Bill for the support of the government, one of the provisions of which is as follows:

"The proceeds of all convict labor on farms and elsewhere, the proceeds of all manufactured products, all farm products, and all other proceeds of the penitentiary system and of all other sources connected therewith, or so much thereof as may be necessary, are hereby appropriated for the maintenance and support of the penitentiary system, including buildings, farms and improvements, and repairs on same for the years ending August 31, 1922, and August 31, 1923, out of which fund shall also be paid any indebtedness of said system not otherwise provided for by specific appropriation, as well as the expenses attached to conveying convicts to the penitentiary and farms"

—it being also shown that no specific appropriation had been made to pay the indebtedness sued upon. The facts relative to the passage of that portion of the appropriation bill, above set out, leaves no ground for doubting that it was intended by the Legislature that the prison commission should use a part of the proceeds arising from the sources named to pay the indebtedness sued on whenever it had sufficient of such proceeds in its hands, above a necessary fund for the maintenance and support of the penitentiary system, to do so. It is apparent, then, that it is the duty of the prison commission to pay said debt out of the proceeds named in the Appropriation Bill, if at any time it may have in its hands sufficient of such proceeds to do so, after reserving however, a sufficient part thereof to maintain and support the penitentiary system. We therefore conclude that, upon final hearing of

plaintiff's suit, the trial court would be authorized to require the prison commission to pay the debt sued upon if at that time there be sufficient funds in its hands subject to such payment as above indicated.

[5, 6] We sustain appellant's contention that the court erred in enjoining the prison commissioners from borrowing money to maintain and support the prison system, and pledging the present or future income for the repayment of such money: First, because the Appropriation Bill upon which appellants relied for any manner of relief specifically provides that the income from the sources mentioned therein shall be used in the maintenance and support of the prison system as well as in payment of the debts mentioned in the bill, and we think the Legislature intended that so much of said income as was necessary for the support and maintenance of the prison system should be used for that purpose before the other debts mentioned were to be paid; and, second, because it is shown by the undisputed evidence that the prison commission had no authority to pledge the income mentioned, and that any effort on its part to do so would be of no effect. And it is also shown by the undisputed evidence of J. A. Herring, chairman of the prison commission, that said commission had been advised by the Attorney General that such income could not be pledged by the commission for any purpose, and that none of the commissioners contemplated pledging said income for any purpose.

[7] In holding that the trial court may upon final hearing of this cause issue a writ of mandamus as above indicated, we did not overlook the contention of appellant that that court had no jurisdiction in such matters, because article 5732, R. C. S. of this state, gives to the Supreme Court exclusive jurisdiction to issue writs of mandamus against any of the "officers of the executive departments of this state," and that the prison commissioners were such officers; but we have reached the conclusion that the prison commissioners are not such officers of any state department as referred to by article 5732, supra, and that they constitute an official board only. Betts v. Johnson, 96 Tex. 360, 73 S. W. 4; McFall v. Board of Education, 101 Tex. 572, 110 S. W. 739. In the cases cited it is held that the term "officers of the state government" means only such officers as are charged with the general administration of state affairs, and not such persons as constitute a board of officers.

What we have already said sufficiently disposes of all the contentions of appellant, and, as we have reached the conclusion that the injunction issued by the trial court was wrongfully issued, we reverse the judgment, and here render judgment refusing the injunction prayed for.