## In re TXU ELECTRIC COMPANY, Relator.

### No. 01–0547.

Supreme Court of Texas.

Argued on Dec. 12, 2001.

Delivered Dec. 31, 2001.

David C. Duggins, Clark Thomas & Winters, Austin, Robert A. Wooldridge, Jo Ann Biggs, Howard V. Fisher, Worsham Forsythe Wooldridge, Dallas, for Relator.

Philip F. Ricketts, Bracewell & Patterson, Austin, Kenneth C. Raney, Jr., Dallas, John Cornyn, Atty. Gen., Steven Baron, Karen Watson Kornell, Office of Atty. Gen., Howard G. Baldwin, First Atty. Gen., Jeffrey S. Boyd, Paul D. Carmona, Office of Atty. Gen., Marion Taylor-Drew (Atty. for Public Utility Counsel), Bryan L. Baker, Office of Atty. Gen., Austin, for Respondent.

1. Hon. David Godbey, District Judge, 160th District Court, Dallas County, sitting by commission of Hon. Rick Perry, Governor of Tex-

PER CURIAM.

In this original proceeding, relator is TXU Electric Co. and respondents are the Public Utility Commission and its three members. TXU seeks relief from portions of the Commission's orders requiring TXU to reverse efforts it has undertaken to mitigate its estimated stranded costs as part of the transition to a deregulated, competitive retail market for the sale of electricity in Texas.

Six MEMBERS of the Court vote to deny relief for different reasons. CHIEF JUSTICE PHILLIPS, joined by JUSTICE ENOCH and JUSTICE GODBEY, would not exercise mandamus jurisdiction because TXU has an adequate remedy at law. JUSTICE BAKER, joined by JUSTICE RODRIGUEZ, would hold that the relief TXU seeks is against the Commission, over which the Court has no original mandamus jurisdiction. JUSTICE BRISTER would hold that the portions of the Commission's orders of which TXU complains do not constitute a clear abuse of discretion. JUSTICE HECHT, joined by JUSTICE OWEN and JUSTICE JEFFERSON, would grant relief.

The petition for writ of mandamus is denied.

Chief Justice PHILLIPS filed a concurring opinion in which Justice ENOCH and Justice GODBEY (Assigned) [1] joined.

Justice BAKER concurred in the judgment and filed an opinion in which Justice RODRIGUEZ joined.

Justice BRISTER (Assigned) [2] concurred in the judgment and filed an opinion.

as, pursuant to section 22.005 of the Texas Government Code.

2. Hon. Scott Brister, Chief Justice, Court of Appeals for the Fourteenth District, sitting by

Justice HECHT filed a dissenting opinion in which Justice OWEN and Justice JEFFERSON joined.

Chief Justice PHILLIPS filed a concurring opinion in which Justice ENOCH and Justice GODBEY (Assigned) join.

Mandamus is an extraordinary remedy available "only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992). To obtain mandamus relief, the relator must demonstrate a clear abuse of discretion for which there is no adequate remedy at law. *Id.* at 839–40. A party establishes that no adequate remedy at law exists by showing that the party is in real danger of permanently losing its substantial rights. *Canadian Helicopters, Ltd. v. Wittig*, 876 S.W.2d 304, 306 (Tex. 1994). Thus, mandamus will not issue absent "compelling circumstances." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). On the record before us, TXU has not shown compelling circumstances for our intervention because it has not established that no adequate remedy is available in the district court. Therefore, I would deny the petition for writ of mandamus.

I

In 1999, the Legislature amended the Public Utilities Regulatory Act (PURA) to establish competition in the retail market for electricity beginning January 1, 2002, and to "protect the public interest during the transition" to competition. Tex. Util. Code § 39.001(a); *City of Corpus Christi v. Pub. Util. Com'n*, 51 S.W.3d 231, 237 (Tex.2001). Under deregulation, the incumbent utilities were required to separate their bundled business into three separate enterprises—a generating company, a transmission and distribution company, and a retail electric provider. Tex. Util. Code § 39.051(b). After January 1, 2002, the generating company will own and operate the generating plants, the transmission and delivery company will deliver the electricity over transmission and distribution lines, and the retail electric provider will sell electricity to end-use customers and provide customer service. Because the generating companies and retail electric providers must use the existing power lines to move electricity from the plant to the retail customer's home or business, the transmission and delivery companies will remain regulated monopolies. The generating companies and the retail electric providers will operate in what are intended to be competitive, unregulated markets.

Underpinning the Legislature's decision to restructure the electric power industry was its finding that regulation was no longer warranted, except for regulating transmission of electricity and overseeing the recovery of stranded costs. Although "stranded costs" have a precise, technical definition under chapter 39 of PURA, Tex. Util.Code § 39.251(7), we have generally described them "as the portion of the book value of a utility's generation assets that is projected to be unrecovered through rates that are based on market prices." *Corpus Christi*, 51 S.W.3d at 238–39. The largest part of stranded costs are attributable to investments in nuclear power plants. *Id.* at 238. The Legislature, agreeing that incumbent utilities should not have to bear these stranded costs, devised a three-phase program for such utilities to recover these costs in the new, unregulated market.

commission of Hon. Rick Perry, Governor of Texas, pursuant to section 22.005 of the Texas Government Code.

Under the first phase, ending on December 31, 2001, the Commission froze retail electric rates. Utilities identified as having stranded costs have been allowed to mitigate them through (1) shifting depreciation from the transmission and delivery assets to the generating assets, Tex. Util. Code § 39.256, and (2) keeping earnings in excess of the allowed rate of return to reduce book value. Tex. Util.Code §§ 39.254. Under the second phase, from January 1, 2002, to December 31, 2003, the Commission is to consider remaining stranded costs in setting the "competition transition charge" or "CTC." Tex. Util. Code § 39.201(b)(3). The CTC is intended to cover the utilities' stranded costs through collection from every customer taking power over the utility's transmission and delivery system, thus making up the difference between a generating plant's book value and its market value. Under the final phase, actual stranded costs are to be calculated in a "true-up" proceeding beginning January 2004. This "true-up" is based on market valuations of the utilities' generation assets. Tex. Util. Code §§ 39.201($l$), 39.262. If stranded costs remain, the Commission can extend the CTC collection period or increase the charge. Tex. Util.Code § 39.201($l$). Conversely, if mitigation efforts and the CTC have overcompensated the utility, the Commission is authorized to make other adjustments. Tex. Util.Code § 39.201($l$)(1)-(4).

Consistent with the statutory scheme, on March 31, 2000, the Commission instituted separate contested case proceedings to consider applications filed by each of the nine incumbent electric utilities in Texas. Because the nine dockets shared many of the same legal and policy issues, the Commission concluded that a supplemental generic proceeding would be the most efficient method for resolving these common issues. Common issues resolved in the generic docket were then applied in each individual docket.

To fulfill the statute's mandates, the Commission segmented each individual docket into four phases. In Phase I, the Commission conducted a hearing on the business separation plan through which the utility proposed to divide itself into a power generation company, a transmission and delivery company, and an affiliated retail electric provider. In Phase II, the Commission conducted a hearing to project the amount of the utility's stranded costs when retail competition begins on January 1, 2002. Tex. Util.Code § 39.201(g). In Phases III and IV, the Commission conducted hearings to determine the actual rates the transmission and delivery company could charge retailers.

The Legislature provided that those utilities the Commission identified as having potentially stranded costs in an April 1998 Report to the Texas Senate Interim Committee on Electric Utility Restructuring (1998 ECOM Report) should use mitigation tools to reduce these potential costs. Tex. Util.Code § 39.254. In this report, the Commission estimated that TXU had potentially two billion dollars in stranded costs, created primarily by TXU's investment in the Comanche Peak nuclear plant. Based on this estimate, TXU began mitigation efforts by shifting depreciation from transmission and delivery assets to generating assets and by applying excess earnings to reduce book value. See Tex. Util. Code §§ 39.254, 39.256.

Before setting rates the transmission and delivery company could charge in 2002, the Commission updated the 1998 ECOM Report in 2001 and concluded that market forces, particularly the surge in natural gas prices, had dramatically impacted TXU's projected stranded costs. Under the new update, the Commission

estimated that TXU now had negative stranded costs in excess of two billion dollars. In other words, TXU's investment in the Comanche Peak nuclear plant, once a liability, had now become profitable because the cost of generating electricity from natural gas plants exceeded that of generating electricity from nuclear plants.

Consumers and retail electric providers, who had intervened in the proceeding to determine the cost of service rates for the unbundled transmission and delivery companies, argued that because TXU's and certain other utilities' updated stranded cost estimates were negative, the Commission should make adjustments for excess mitigation costs when setting transmission and delivery charges. TXU argued that the Commission had no authority to revise its stranded cost estimates because the statute did not authorize the Commission to update the 1998 ECOM Report except for CTC setting purposes or to revisit the mitigation issue until the true-up proceeding in 2004. The Commission disagreed; and on November 9, 2000, it determined in the generic docket that utilities with substantial negative stranded costs estimates should stop redirecting depreciation expense and applying annual excess earnings to reduce stranded generation assets.

On June 5, 2001, the Commission applied this ruling to TXU in an interim order issued in TXU's individual docket. The Commission found that TXU should discontinue mitigation because its updated ECOM analysis reflected that TXU presently had a negative $2.7 billion in stranded costs. Because TXU had already redirected $798 million in depreciation expense, the Commission instructed TXU to reassign the expense back to transmission and distribution assets. Similarly, because TXU had previously applied $888 million in excess earnings to generation assets, the Commission further directed that those excess earnings be returned to ratepayers as credits on monthly bills over a seven-year period.

TXU promptly petitioned this Court to mandamus the Commission to rescind its June 5 order and subsequently sought similar relief from the Travis County district court as well. TXU alleges that by disregarding the statutory scheme, the Commission will cause competition to develop "differently" than the Legislature intended, and that this difference will cause irreparable harm because it will impact the ability of TXU's affiliated retail electric provider to compete during deregulation's first years. The district court has not acted on TXU's petition.

While the mandamus proceeding was pending here, the Commission issued its final order in TXU's docket on October 3, 2001. This order addressed numerous issues raised during the four phases of the proceeding, and it also incorporated the June 5 ruling on excess mitigation. TXU sued the Commission in Travis County district court on December 17, 2001, for judicial review of the final order. *See* TEX. UTIL.CODE § 15.001; TEX. GOV'T CODE § § 2001.145, 2001.171.

## II

I agree with JUSTICE HECHT and JUSTICE BRISTER that this Court has jurisdiction to mandamus the individual members of the Public Utility Commission. But I differ with JUSTICE HECHT's conclusion that we should exercise that authority in this case, and I do not reach the question of whether the Commission has abused its discretion, which is the basis of JUSTICE BRISTER's opinion.

In my opinion, TXU has not shown that relief is unavailable in the district court. The issues TXU raises in its appeal to the district court are the same that it presents here. JUSTICE HECHT argues that even if

this is so, the district court cannot prevent irreparable harm because it cannot act before the second phase of deregulation begins on January 1, 2002. But on this record, I cannot determine that irreparable harm will befall TXU if we do not act.

Admittedly, mandamus is a more expeditious remedy than appeal, but the delay inherent in the appellate process is ordinarily not sufficient reason to justify us to act. *Walker*, 827 S.W.2d at 842. In its harm analysis, TXU urges that the Commission's erroneous actions will cause competition to unfold in a manner different from that contemplated by the Legislature with unknown but irreparable consequences. Thus, TXU argues that we should mandamus the Commissioners to preserve the integrity of the Legislature's plan for deregulation. Our mandamus authority, however, is not a general, supervisory power. *See* TEX. GOV'T CODE § 22.002(a); *Pope v. Ferguson*, 445 S.W.2d 950, 953 (Tex.1969). Our exercise of the power "is justified only when parties stand to lose their substantial rights," *Walker*, 827 S.W.2d at 842, that is, rights personal to the party seeking relief. If mandamus were justified whenever a government official or a lower court misread a statute, mandamus would supplant appeal as the normal avenue for statutory interpretation.

Moreover, TXU itself has never, in any brief, motion or argument, asked this Court to expedite this proceeding or act to meet any prescribed deadline.[1] More importantly, if TXU can demonstrate immediate, irreparable harm, the district court is authorized to grant an immediate stay in TXU's appeal. *See* TEX. UTIL.CODE

§ 15.04. While any stay the district court issues may itself be stayed if the Commission appeals the order, *see Pub. Util. Comm'n v. Coalition of Cities for Affordable Utility Rates*, 776 S.W.2d 221, 222 (Tex.App.-Austin 1989, no writ), the appellate court can itself grant a stay if necessary to preserve the subject matter of the appeal and protect its own jurisdiction. *See City of Dallas v. Wright*, 120 Tex. 190, 36 S.W.2d 973, 975 (1931); *Riverdrive Mall, Inc. v. Larwin Mortgage Investors*, 515 S.W.2d 2, 4 (Tex.Civ.App.-San Antonio 1974, writ ref'd n.r.e.). The lower courts thus have full authority to review and correct any errors that TXU alleges and proves and to protect it from irreparable harm during that process.

JUSTICE HECHT argues at some length that this case is similar to *Perry v. Del Rio*, 67 S.W.3d 85 (Tex.2001). But in *Perry*, two district courts each asserted jurisdiction over the same parties in the same dispute, working against a deadline imposed by a three-judge federal court. Only this Court could timely determine which of the two courts had the dominant jurisdiction to proceed because the deadline simply did not leave room for normal appellate remedies. Here, only one district court has jurisdiction, and it has full authority to resolve TXU's complaints.

JUSTICE HECHT claims that I "ignore[ ] precedent" because we have granted mandamus before, in discovery disputes and other matters. And he points to our holding in *CSR, Ltd. v. Link*, 925 S.W.2d 591 (Tex.1996), that "exceptional circumstances may make a right of appeal inadequate."

---

1. Justice Hecht questions why I do not address Reliant Energy's Petition for Mandamus, suggesting that it articulates reasons for expedited action in this case. It does not. Reliant did file a motion to expedite its own Petition for Mandamus by consolidating it with TXU's because the two petitions addressed the same issues. Reliant's Motion to Consolidate and Expedite asserts that "[i]t is in the public interest to address and resolve those issues in an expedited and consolidated fashion as they concern both Reliant and TXU," but it does not ask this Court to act on either petition by a certain date.

In all these cases, however, we granted conditional mandamus against a trial court that had already ruled. Here, of course, the trial court has jurisdiction but has not yet made a decision.

Nor is this case similar to three related cases we recently considered involving securitization bonds, a legislatively-created financing mechanism allowing an electric utility to issue low-cost bonds to retire certain debts known as "regulatory assets." *TXU Electric Co. v. Pub. Util. Comm'n,* 51 S.W.3d 275 (Tex.2001). The deregulation statute expressly provided for an interlocutory appeal of these decisions to district court, and it directed that both the district court and this Court should determine the appeals "as expeditiously as possible with lawful precedence over other matters." TEX. UTIL.CODE § 39.303(f). In all other cases, however, PURA requires that each Commission proceeding under section 39 be conducted as a contested case proceeding under the APE. TEX. UTIL. CODE § 39.003. On no other issue, including the one before us today, did the Legislature provide for an expedited review of any aspect of the deregulation process. I would not circumvent the Legislature's scheme for orderly review when an adequate legal remedy is available.

\* \* \*

For the foregoing reasons, and without addressing whether the Commission has abused its discretion, I would deny Relator's petition for writ of mandamus.

Justice BAKER, joined by Justice RODRIGUEZ, concurring in the judgment only.

Over ninety-eight years ago, this Court held that it did not have jurisdiction to issue mandamus against a board of state officers. *See Betts v. Johnson,* 96 Tex. 360, 73 S.W. 4, 5 (1903). Since that deci-

sion, this Court has, with one exception, adhered to this holding. *See Superior Oil Co. v. Sadler,* 458 S.W.2d 55, 56 (Tex.1970); *Givens v. Woodward,* 145 Tex. 150, 196 S.W.2d 456, 456 (1946); *McLarty v. Bolton,* 144 Tex. 490, 191 S.W.2d 850, 850 (1946); *McFall v. State Bd. of Educ.,* 101 Tex. 572, 110 S.W. 739, 740 (1908); *see also Texas Liquor Control Bd. v. Cont'l Distilling Sales Co.,* 199 S.W.2d 1009, 1013 (Tex.Civ.App.-Dallas 1947, no writ); *Herring v. Houston Nat. Exch. Bank,* 241 S.W. 534, 540 (Tex.Civ.App.-Galveston 1922, no writ). *But see State v. Thomas,* 766 S.W.2d 217, 220 (Tex.1989).

In *Betts,* the Court construed a predecessor statute to section 22.002(a) of the Texas Government Code. *Betts,* 73 S.W. at 4. Today, despite this precedent, the Court assumes jurisdiction when it does not exist to reach the merits of TXU's petition. Because I believe this Court does not have jurisdiction to mandamus a state board or commission, I can only concur in the Court's judgment that TXU is not entitled to mandamus relief.

## I.  PROCEDURAL BACKGROUND

In March 2000, nine electric utilities (including TXU) each filed an application requesting the Public Utilities Commission to approve unbundled costs of service rates under section 39.201 of the Public Utilities Regulation Act (PURA). Because the nine cases raised similar issues, the PUC created Docket No. 22344, a "generic-docket" proceeding, to consider the threshold issues that would impact all nine cases. In this proceeding, the PUC issued several orders that identified allowable modifications to the PUC's excess costs over market (ECOM) model. Under the generic-docket orders, the PUC reran the ECOM model to determine the utilities' estimated stranded costs. And, in certain cases, including TXU's, the model generat-

ed a negative number for the utility's estimated stranded costs.

In October 2000, because of these negative estimates, the administrative law judge issued an order certifying issues to the PUC. Specifically, the PUC had to determine whether the law contemplates a utility having negative excess cost over market and whether the PUC has authority to consider and "remedy" excess mitigation. The parties filed briefs on both issues, which the PUC considered in an open meeting beginning on November 1, 2000. On November 14, 2000, the PUC entered its order on the certified issues and held that it did have the authority—and the obligation—to remedy excess mitigation. On November 29, 2000, TXU filed its motion for rehearing with respect to the PUC's certified-issues order as it affected TXU. On November 30, 2000, the PUC declined to consider TXU's motion.

On December 29, 2000, TXU sued the PUC in a Travis County District Court, seeking judicial review of the PUC's certified-issues order. TXU asserted that the PUC erred in entering this order because it prejudices TXU's substantial rights. TXU asked the district court to reverse the PUC's order and remand to the PUC for further proceedings. This suit remains pending.

On June 1, 2001, the PUC entered an "Interim Order" noting TXU's overrecovery of stranded costs under the new ECOM model and thus ordering TXU to reverse its stranded-costs mitigation. On June 20, 2001, TXU filed its petition for writ of mandamus with this Court. The Court requested a response and full briefing. TEX.R.APP. P. 52.8(b)(1),(2).

Subsequently, the Court set the petition for oral argument on December 12, 2001. TXU asserts that the PUC abused its discretion by contravening statutory procedures when it entered the interim order against TXU. TXU names the PUC, and its three Commissioners individually, as respondents. However, TXU only requests relief against the PUC. The parties argued the case before the Court on December 12, 2001. A week after oral argument, on December 17, 2001, TXU filed a second suit involving the same orders in another Travis County District Court, and again made the PUC the only defendant. The second suit also only asked for relief against the PUC in the form of a reversal of the Commission's order. Notably, the issues that TXU raises here are the same issues it raises for judicial review in both suits now pending in different Travis County District Courts.

## II. THE THRESHOLD ISSUE

The preliminary issue the Court should consider is whether section 22.002(a) of the Texas Government Code confers original jurisdiction upon this Court to grant mandamus relief against the PUC in this case. TXU argues that it does and relies on *State v. Thomas*, 766 S.W.2d at 217, and *Chemical Bank & Trust Co. v. Falkner*, 369 S.W.2d 427 (Tex.1963), to support that argument.

## III. APPLICABLE LAW

### A. SECTION 22.002(A)

The Texas Government Code provides:

The supreme court or a justice of the supreme court may issue writs of procedendo and certiorari and all writ of quo warranto and mandamus agreeable to the principles of law regulating those writs, against a district judge, a court of appeals or a justice of a court of appeals, or any officer of state government except the governor, the court of criminal appeals, or a judge of the court of criminal appeals.

TEX. GOV'T CODE § 22.002(a). This provision has its genesis in an 1892 statute that granted this Court power to mandamus an officer of state government, excepting the governor. *See* Act of April 13, 1892, 22nd Leg., 1st C.S., ch. 14, 1892 Tex. Gen. Laws 385. After 1892, the Legislature amended this statute several times before codifying it in our Government Code in 1985. *See* TEX.REV.CIV. STATS. arts. 946, 949, 4861 (Vernon 1895); TEX.REV.CIV. STATS. arts. 1526, 1526, 1528, 1529, 5732 (Vernon 1911); Act of Mar. 28, 1913, 33d Leg., R.S., ch. 55, § 1, 1913 Tex. Gen. Laws 108; Act of Mar. 15, 1917, 35th Leg., R.S., ch. 75, § 1, 1917 Tex. Gen. Laws 141; Act of Feb. 14, 1930, 41st Leg., 4th C.S., ch. 4, § 1, 1930 Tex. Gen. Laws 4; Act of June 8, 1981, 67th Leg., R.S., ch. 291, § 19, 1981 Tex. Gen. Laws 773; Act of June 12, 1985, 69th Leg., R.S., ch. 480, § 1, 1985 Tex. Gen. Laws 1724.

All the predecessors to section 22.002(a) used similar language relevant to the issue here. That is, the statutes, in relevant part, provided that this Court has original jurisdiction to issue writs of mandamus against an "officer of state government."

## B. CASE LAW

The first occasion this Court had to determine whether it could exercise its original mandamus jurisdiction over a state board or commission was in 1903. *See Betts,* 73 S.W. at 4. In that case, Betts moved for mandamus to compel Johnson and others, as members of the Board of Eclectic Medical Examiners for the State of Texas, to issue Betts a license to practice medicine. The Court held it did not have jurisdiction to grant a writ of mandamus in such a case. *Betts,* 73 S.W. at 4. The Court determined that "officer of state government" does not encompass all state officers for purposes of this Court's original mandamus jurisdiction. Rather, the Court concluded, the Legislature in-

tended that jurisdiction extend only to state officers who are the "heads of state departments." *Betts,* 73 S.W. at 4.

After defining the limited scope of the term "state officer," the Court noted that Betts actually sought mandamus against a board of officers and not against a single officer. It explained that if the statute's purpose was to empower the Court to issue the writ against a board of officers as well as against a single officer, the statute's language would have been " 'any officer *or board of officers* of the state government.' " *Betts,* 73 S.W. at 5 (emphasis added). Consequently, the Court denied the writ.

Since *Betts,* the Court has not wavered from its view that its original mandamus jurisdiction does not extend to *all* state officers—or, more importantly, to boards or commissions of state officers. *See, e.g., Superior Oil Co.,* 458 S.W.2d at 56 (holding this Court may not issue mandamus against state boards and commissions) (citations omitted). As recently as 1999, this Court reaffirmed that holding. *See In re Nolo Press/Folk Law, Inc.,* 991 S.W.2d 768, 776 (Tex.1999) (*citing Superior Oil Co.* and *Betts* ); *see also A & T Consultants, Inc. v. Sharp,* 904 S.W.2d 668, 684 (Tex.1995); (Hecht, J., dissenting) (observing that "any officer of state government" under section 22.022(a) does not include a board of officers and, therefore, this Court lacks jurisdiction to mandamus such a board) (citing *Betts* ).

## IV. ANALYSIS

The PUC is a Texas administrative agency the Legislature created under the PURA. *See* TEX. UTIL.CODE § 12.001. The PUC is comprised of three commissioners whom the Governor appoints with the senate's advice and consent. *See* TEX. UTIL. CODE § 12.051. As a legislatively created

entity, the PUC can only exercise the power that the law, in clear and express statutory language, confers upon it. *See* Tex Util.Code § 12.001; *Key W. Life Ins. Co. v. State Bd. of Ins.*, 163 Tex. 11, 350 S.W.2d 839, 848 (1961); *Railroad Comm'n v. Rowan Oil Co.*, 152 Tex. 439, 259 S.W.2d 173, 176 (1953).

The PURA provides that the PUC has "the general power to regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated or implied by [statute] that is necessary and convenient to the exercise of that power and jurisdiction." Tex. Util.Code § 14.001. However, the PURA provisions that describe the PUC's powers authorize the PUC to act as an entity and do not give the individual commissioners any separate powers. *See, e.g.*, Tex. Util.Code §§ 14.001–14.057, 32.001, 39.103, 39.201. Thus, the PURA does not confer any powers upon an individual commissioner so that he or she has separate and distinct duties from the other commissioners or so that he or she may act alone.

TXU recognizes that the PUC is a distinct entity of the state and that it acts only through its three commissioners.

- Following the PUC's November 14, 2000 certified-issues order, TXU sued the PUC as the only defendant when it sought judicial review of that order in the Travis County District Court.
- In that petition, TXU recognizes the PUC as an entity and requests relief only against the PUC in the form of reversing the PUC order.
- TXU did not join the individual commissioners as parties in that suit.

In its mandamus petition, TXU complains about the same certified issues, and the PUC interim order against TXU based on those certified issues, as it does in its district court suit.

- Here, though, TXU names the three PUC members as additional, individual respondents.
- But, as in the district court cases, TXU seeks no relief against any individual commissioner and requests relief only against the PUC.
- Further, in its brief on the merits, TXU likewise asserts that the issue is whether the *PUC* abused its discretion when it entered the orders about reversing stranded-cost mitigation.
- And, during oral argument, TXU admitted that it only sought relief against the PUC and that it named the PUC commissioners individually only because TXU contends they are "state officers."

Additionally, a week after oral argument in this case, TXU filed a second suit in another Travis County District Court complaining about the PUC's final order as it affected TXU.

- In this second suit, TXU sued the PUC as the only defendant, and did not join the individual Commissioners as parties.
- In this second suit, TXU again recognizes the PUC as a entity and requests relief only against the PUC in the form of reversing the PUC order.

TXU has consistently sought relief only against the PUC in every proceeding it has initiated. It is clear that TXU recognizes the PUC as a separate entity and as the only party against whom it can secure relief. Consequently, it is also clear, that by naming the individual Commissioners as respondents in this proceeding, TXU did so purely to circumvent this Court's holdings that section 22.002(a) does not confer original jurisdiction for this Court to mandamus state boards or commissions.

In its reply brief on the merits, TXU more precisely argues that this Court has original mandamus jurisdiction here because this Court issued mandamus against the individual commissioners in *Thomas*, 766 S.W.2d at 217. TXU contends that the State's attempts to distinguish *Thomas* fail. Further, TXU urges that *Thomas* is not an "aberration" as the State contends.

*Thomas* is in fact an aberration. Moreover, it was wrongly decided. In *Thomas*, the State, as an electricity consumer, filed a petition for writ of mandamus against Dennis Thomas, Jo Campbell, and Mart Greytok, the PUC's chairman and commissioners, respectively. The State sought mandamus to compel the individual commissioners to perform their duty to permit the Attorney General to intervene in the underlying administrative proceeding. The State asserted jurisdiction under section 22.002(a) of the Government Code.

Though the record indicates that the PUC was not a respondent in *Thomas*, the Court disregarded this omission in its opinion. Instead, the Court concluded that the Public Utility Commission could not constitutionally deny the Attorney General's intervention on behalf of consumer state agencies. *Thomas*, 766 S.W.2d at 219. And then, without discussing its mandamus jurisdiction, it granted the writ and ordered the "Public Utility Commission"—not the individual commissioners—to vacate its order. *Thomas*, 766 S.W.2d at 220. The Court's judgment likewise ordered mandamus against the "Public Utility Commission."

Accordingly, TXU's assertion that the *Thomas* Court issued mandamus against the individual commissioners is incorrect. Moreover, *Thomas* is an aberration for three reasons: (1) *Thomas* failed to question the State's assertion that the Court had jurisdiction under section 22.002(a); (2) the Court did not grant relief against the only three respondents the State named in the petition; and (3) the Court improperly granted relief against the PUC, an entity not a party to the case. Furthermore, for reasons unknown, the Court completely ignored the fact that it did not have original mandamus jurisdiction over the PUC in the first instance. *See Superior Oil Co.*, 458 S.W.2d at 56, *Betts*, 73 S.W. at 5; *see also A & T Consultants*, 904 S.W.2d at 684 (Hecht, J., dissenting).

TXU also relies on *Chemical Bank*, 369 S.W.2d at 427, to support its jurisdictional argument in this case. However, *Chemical Bank* is readily distinguishable. In that case, Chemical Bank sought mandamus from this Court to compel Falkner, as Banking Commissioner of Texas, to issue Chemical Bank a certificate of authority to operate in Harris County, Texas. Two banks in Harris County, who opposed issuing a charter to Chemical Bank, intervened in the mandamus proceeding. The intervenors argued that the Court had no jurisdiction to issue mandamus against the Banking Commissioner, because he was not a state officer within article 1733's meaning. *Chemical Bank*, 369 S.W.2d at 429 (citing language in article 1733, a predecessor to section 22.002(a)).

The Court concluded that Falker, as the Banking Commissioner, is an officer of state government within the statute's meaning. The Court pointed out that although Falkner was a Finance Commission employee, this did not prevent Falkner from being an officer of the state government. The Court observed that Falkner was far more than just a Finance Commission employee, because the many powers and duties the Legislature conferred upon him were not subject to the Finance Commission's control. *Chemical Bank*, 369 S.W.2d at 430. For example, the Court observed, although Falkner's

duties included presiding over Finance Commission meetings, he did not vote unless to break a tie. And he had other powers, such as issuing a charter, that the Finance Commission did not control. *Chemical Bank*, 369 S.W.2d at 430–31. The Court concluded that the Legislature gave the Banking Commissioner, individually, the authority to carry out the general administration of the State's banking affairs. Thus, the Court held that Falkner was performing sovereign functions of the government for the protection and benefit of the public and, as such, he was a state officer as article 1733 contemplated. *Chemical Bank*, 369 S.W.2d at 430.

*Chemical Bank* involved a single state government officer and not a board or commission. Further, the state officer subject to mandamus in *Chemical Bank* had statutory powers and duties apart from those of the commission for which he worked. *Chemical Bank*, 369 S.W.2d at 430. It is thus distinguishable from this case.

In sum, this case is not any different from *Betts* and its progeny which recognize that, under section 22.022(a) and its predecessor statutes, this Court does not have original jurisdiction to mandamus a state commission or board. Accordingly, the Court does not have original mandamus jurisdiction over the PUC and should dismiss TXU's petition for want of jurisdiction.

## V. THE COURT'S WRITINGS

Seven Justices agree that the Court has jurisdiction to review TXU's petition. Of the seven Justices who agree we have jurisdiction, four would deny TXU relief, but for different reasons. *See* 67 S.W.3d at 132 (Phillips, C.J., concurring); 67 S.W.3d at 145 (Brister, J., concurring).

Three Justices not only find we have jurisdiction but also would grant relief. Because I believe that the Court has no jurisdiction as a threshold matter, I believe it is not only appropriate but necessary that I comment on Justice Hecht's and Chief Justice Phillips' writings.[1]

### A. JUSTICE HECHT'S DISSENT

Justice Hecht dedicates about thirty percent of his writing to attempt to explain why he believes this Court has original jurisdiction to mandamus the PUC commissioners. Ironically, Justice Hecht required only a sentence or two in more recent cases to hold that mandamus jurisdiction does not exist against state boards or commissions. *See In Re Nolo Press*, 991 S.W.2d at 776; *A & T Consultants*, 904 S.W.2d at 684 (Hecht, J., dissenting). But to avoid this and other precedent and to reach his desired result, Justice Hecht purposely misstates the threshold issue here.

My position is that the threshold issue the Court must determine is whether we have original jurisdiction under section 22.002(a) to mandamus the *Public Utility Commission*. And TXU's naming the individual commissioners as respondents here is nothing more than a ruse—apparently an effective one given the Court's holding today—to divert this Court's attention from this issue.

But Justice Hecht intentionally mischaracterizes the jurisdiction issue to raise it as a strawman so he can then knock it down, thereby allowing him to conclude that "we have jurisdiction to mandamus *the members of the Commission* as TXU requests." 67 S.W.3d at 150 (Hecht, J., dissenting) (emphasis added). Justice Hecht relies on four cases to argue that

---

1. Justice Hecht's dissent is the only writing that discusses the jurisdiction issue. I pre-

sume, therefore, that the other writers adopt his entire jurisdiction argument *sub silentio*.

my view is inconsistent with Texas law. *See McFall*, 110 S.W. at 739; *Middlekauff v. State Banking Bd.*, 111 Tex. 561, 242 S.W. 442 (1922); *Thomas*, 766 S.W.2d at 217; *State Banking Bd. v. Winters State Bank*, 13 S.W.2d 391 (Tex.Civ.App.-Austin 1929, writ ref'd). However, these cases are not inconsistent with my real jurisdiction argument.

In *McFall*, the relator requested this Court to issue mandamus against certain *individuals*—the Governor, the Comptroller, and the Secretary of State—who constituted the State Board of Education. *McFall*, 110 S.W. at 739. Because the Court did not have original mandamus jurisdiction over the Governor, the Court concluded that it could not grant relief. Without further elaboration, the Court only stated that "[t]he writ must go against all or none...." *McFall*, 110 S.W. at 740. The Court then noted that, in any event, it could not grant the relief requested because the relator asked the Court to set aside the Board's order and to make a different decision. *McFall*, 110 S.W. at 740. Because we cannot issue mandamus to compel a tribunal to decide an issue in a certain way, the Court suggested that the relator seek mandamus relief in the trial court against a lesser school official who had authority to carry out the board's order. *McFall*, 110 S.W. at 740.

Although the relator in *McFall* sought relief against individuals, the Court recognized it could not—so it did not—grant relief against the board. Moreover, the Court recognized it could not issue mandamus to compel an entity to make a certain decision. Consequently, although *McFall* is factually distinguishable, its holding is consistent with my view that this Court does not have original jurisdiction under section 22.022(a) to mandamus the PUC to change its rulings in an administrative order.

Likewise, *Middlekauff* does not support Justice Hecht's contention that my jurisdiction analysis is contrary to Texas law. The relator in *Middlekauff* sought mandamus relief against several individuals and entities—the State Banking Board, the Commissioner of Insurance and Banking, the State Treasurer, and the Attorney General—to compel payment of monies from the State's guaranty fund. *Middlekauff*, 242 S.W. at 442. It is unclear against whom the Court issued mandamus, because the opinion only states that the suit would "be dismissed as to the respondents no longer in office, and that a writ of mandamus be issued against the remaining respondents...." *Middlekauff*, 242 S.W. at 443. But at the time, the State Banking Board comprised the Attorney General, the Commissioner of Insurance and Banking, and the Treasurer. Act of May 12, 1909, 31st Leg., 2d C.S., ch. 15, § 2, 1909 Tex. Gen. Laws 406, 406. These are the same individuals against whom the relator sought mandamus relief. Accordingly, *Middlekauff* is distinguishable from this case and, therefore, is not contrary to my jurisdiction argument. *Middlekauff*, 242 S.W. at 443.

*Winters State Bank* is also distinguishable. 13 S.W.2d at 391. In *Winters State Bank*, the court of appeals held that, although the banking commissioner did have a duty to pay funds as alleged, the State Banking Board had not waived its sovereign immunity from a suit to recover monies from the guaranty fund. *Winters State Bank*, 13 S.W.2d at 392. But the court of appeals opined that, because "it is the clear ministerial duty of the state banking board and the banking commissioner to return [the funds]," the plaintiff could seek mandamus from this Court. *Winters State Bank*, 13 S.W.2d at 393. For this proposition, the court of appeals cited a predecessor statute to section

22.002 *(c)*, the provision conferring original mandamus jurisdiction on this Court to compel officers of the State's executive departments to perform ministerial duties. *Winters State Bank*, 13 S.W.2d at 393. Although the court of appeals also cited *Middlekauff*, its reliance on a different jurisdictional statute, and its focus on the individual banking commissioner's ministerial duties, shows it is distinguishable and does not control the outcome here.

Next, I need not dwell further on why *Thomas* is an aberration and was wrongly decided. But Justice Hecht pontificates that, in *Thomas*, the Court's granting relief against the PUC rather than the individual commissioners was "a technical flaw immaterial to the scope of the Court's original mandamus jurisdiction." He also opines that "[t]he Court's mistake in the rendition of judgment does not detract from its decision to grant relief against the state officers it clearly determined were within its original mandamus jurisdiction." 67 S.W.3d at 156 (Hecht, J., dissenting). Such reasoning borders on the ludicrous.

Justice Hecht's cursory conclusion that our issuing mandamus against an entity not a party to the suit is a mere "technical flaw" flouts a bedrock principle in Texas jurisprudence. No court, including this one, can grant relief against a person or entity that is not a party to the litigation. *See, e.g., Werner v. Colwell*, 909 S.W.2d 866, 869 (Tex.1995). Moreover, the *Thomas* Court never discussed its jurisdiction. Indeed, even Justice Hecht, who dissented in that case, recognized that "[t]he Court assumes, without discussion, the availability of mandamus in this case." *Thomas*, 766 S.W.2d at 225 (Hecht, J., dissenting). Thus, contrary to Justice Hecht's cavalier contention, it is not so "clear" that the Court determined the commissioners were within its original mandamus jurisdiction.

*See* 67 S.W.3d at 158 (Hecht, J., dissenting).

Furthermore, Justice Hecht accuses me of unfairly taking two sentences from TXU's petition and brief to conclude that "TXU is not entitled to relief against the individual commissioners." 67 S.W.3d at 158 (Hecht, J., dissenting). Justice Hecht deliberately misstates my jurisdiction argument when he urges that my position is we cannot issue mandamus relief against the individual commissioners. The record demonstrates that TXU's trial court pleadings and briefs in this Court all only seek relief against the PUC as an entity. Not once does TXU pray for relief against the individual commissioners. This is because only the PUC, as an entity, entered the order TXU complains about. And only the PUC as an entity, and not an individual commissioner, has authority to remedy any wrong in that order. Consequently, TXU names the individual commissioners as respondents here only in an attempt to invoke this Court's mandamus jurisdiction and to avoid the well-established procedures our Legislature has created for judicial review of administrative orders.

Finally, Justice Hecht fails to refute my argument that this case will provide the basis for parties to seek mandamus from this Court against state boards and commissions whenever they allege that an administrative order, such as the one here, is erroneous. Justice Hecht contends that "the demise of the ordinary process for judicial review of ordinary administrative decisions" will not happen because the Court knows how to "turn away *ordinary* cases." 67 S.W.3d at 158 (Hecht, J., dissenting) (emphasis added). But Justice Hecht's reasoning begs the question and presupposes that our mandamus jurisdiction depends on whether a case is "ordinary." This is absolutely not true under

Texas law. In an original proceeding, the threshold issue is whether this Court has mandamus jurisdiction under the parameters Texas's Legislature and citizens have defined. *See* TEX. GOV'T CODE § 22.002; TEX. CONST. art. V, § 3. Then, *if* jurisdiction exists, only then may the Court consider the case's nature—extraordinary or otherwise—as part of the Court's merits inquiry for determining whether it should grant relief. *See Canadian Helicopters Ltd. v. Wittig,* 876 S.W.2d 304, 309 (Tex. 1994) (stating, in reviewing a trial court order denying a special appearance, that appeal may be inadequate and thus mandamus relief appropriate if the Court determines the case presents "extraordinary" circumstances). Thus, Justice Hecht's response does not disprove my position that, after this case, parties can simply name individual members of a state board or commission to obtain relief that Texas's Legislature and citizens have made available only in the trial courts or through the ordinary administrative judicial review process. *See* TEX. GOV'T CODE §§ 2001.171–.178; TEX. UTIL.CODE § 15.001; TEX. GOV'T CODE § 24.007; TEX. CONST. art. V, § 8.

In sum, Justice Hecht's jurisdiction analysis purposely ignores the real issue here-whether this Court has original mandamus jurisdiction over the PUC. The answer is "no" because we have steadfastly held that this Court's jurisdiction under section 22.002(a) does not extend to state boards or commissions. And, it logically follows that TXU cannot confer jurisdiction on this Court simply by naming the individual PUC commissioners as respondents.

### B. CHIEF JUSTICE PHILLIPS' CONCURRENCE

In rejecting TXU's request for mandamus relief, Chief Justice Phillips frames TXU's issue as whether "we should mandamus the Commissioners to preserve the integrity of the Legislature's plan for deregulation." 67 S.W.3d at 135 (Phillips, C.J., concurring). But this is not the relief TXU requests. As the record shows, in this mandamus proceeding, although TXU named the commissioners individually, TXU has not asked for any relief against an individual commissioner. TXU requests relief only against the Public Utility Commission as a legislatively created entity.

I do not disagree with the premise that in appropriate circumstances, this Court does have original jurisdiction to grant mandamus relief against "any officer of state government except the Governor." TEX. GOV'T CODE § 22.002(a). But that power does not encompass the power to mandamus a board or commission as an entity because that power lies not in our Court but in a Travis County District Court. *See* TEX. CONST. art. V, § 8; TEX. GOV'T CODE § 24.007; *see also In Re Nolo Press,* 991 S.W.2d at 776; *A & T Consultants, Inc.,* 904 S.W.2d at 684 (Hecht, J., dissenting); *Superior Oil Co.,* 458 S.W.2d at 56; *Betts,* 73 S.W. at 5.

Ignoring this Court's precedent that we do not have jurisdiction to mandamus boards or commissions, and assuming jurisdiction when we have none, affects not only the case we decide today, but the course of administrative law proceedings in the future. Chief Justice Phillips' opinion alludes to this problem when he states: "If mandamus were justified whenever a government official or a lower court misread a statute, mandamus would supplant appeal as a normal avenue for statutory interpretation." 67 S.W.3d at 135 (Phillips, C.J., concurring). It seems to me that the real import of the Court's decision today is what will happen in future administrative proceedings when a party is dissatisfied with a board or commission order. That party will not only file a petition for

judicial review in a Travis County District Court, but will also file a petition for mandamus in this Court. And the party can rely on this case to do so. I refer the Court to what happened after this Court created a common law tort cause of action for an insurer's breach of its duty of good faith and fair dealing. *See Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987). After *Arnold,* every lawsuit by an insured against an insurer in Texas almost always included a bad-faith allegation, at least every one a competent lawyer filed. *See State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 454 (Tex.1997) (Hecht, J., dissenting).

Opening the door for this Court to mandamus state boards or commissions, with the lure that a party may achieve a quick fix, in all probability will dramatically increase the number of such mandamus petitions filed directly in this Court. And it will thus supplant the appellate process already in place as a normal avenue for relief from a board or commission order. Accordingly, continuing to adhere to precedent, and denying TXU's petition for want of jurisdiction will reinforce and reaffirm the legislatively adopted appellate process for determining disputes involving administrative boards, commissions, and agencies.

## VI. CONCLUSION

Today, the Court overturns ninety-eight years of precedent holding that section 22.002(a) does not confer original jurisdiction on this Court to mandamus state boards or commissions. I am convinced that we do not have jurisdiction to entertain this petition, and the Court should dismiss it for want of jurisdiction. Be-

cause the Court decides otherwise, I concur in the Court's judgment only to the extent that it determines TXU is not entitled to mandamus relief.

Justice BRISTER, concurring.

Mandamus should be granted "only to correct a clear abuse of discretion or the violation of a legal duty when there is no other adequate remedy at law."[1] I agree with JUSTICE HECHT there is no adequate legal remedy; the difficulty of the question presented is exceeded only by its importance, and there is no telling what effect judicial intervention or delay may have. But because I can find no abuse of discretion or violation of a duty imposed by law—certainly none that is clear—I agree with CHIEF JUSTICE PHILLIPS that mandamus should be denied.

The facts not contested in this proceeding bear repeating. During the last two years while electric rates were frozen, TXU retained almost $1.7 billion in excess revenues that otherwise would have been refunded to consumers. The Legislature authorized this retention to help TXU recover stranded costs, although in hindsight it now appears TXU did not have any. TXU enters competition with the opposite of stranded costs—its power generation assets will be worth almost $3 billion more than their book value. If nothing is done to remedy this excess until 2004, competition will be stifled. These findings by the PUC may be wrong, but for purposes of this mandamus proceeding we must take them as true.[2]

Whether the Legislature foresaw this situation when drafting the statute is unclear, but one thing is certain—it made no specific provision for it. This is not a case,

1. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001).

2. *Brady v. Fourteenth Court of Appeals,* 795 S.W.2d 712, 714 (Tex.1990) (holding appellate court may not deal with disputed areas of fact in original mandamus proceeding).

as TXU argues, in which the Legislature prescribed a plan that the PUC refuses to follow. As shown below, not one of the statutory provisions on which the parties rely tells the PUC what to do in this situation. As a result, TXU asserts the PUC can do nothing, at least not for several years.

But state agencies have never been strictly limited to specific statutory provisions. If legislators could foresee every contingency, there would be little need for agencies. Because they cannot, agencies also have whatever implied powers are reasonably necessary to fulfill their regulatory duties.[3]

In the Public Utility Regulatory Act (PURA), the Legislature directed the PUC to deregulate the electric industry in a way that encourages competition.[4] Given its factual findings and this legislative directive, the PUC must do something. Because all parties implicitly agree the statute is ambiguous, and the PUC's interpretation is just as reasonable as any other, no clear legal violation has been shown.

### Section 39.254

TXU relies on two sections of the statute. First, it argues PURA section 39.254 gives it a right—indeed a duty—to mitigate the stranded costs it had in 1998. That is not what the section says:

This subchapter provides a number of tools to an electric utility to mitigate stranded costs. Each electric utility

that was reported by the commission to have positive "excess costs over market" (ECOM), denoted as the "base case" for the amount of stranded costs before full retail competition in 2002 with respect to its Texas jurisdiction, in the April 1998 Report to the Texas Senate Interim Committee on Electric Utility Restructuring entitled "Potentially Strandable Investment (ECOM) Report: 1998 Update," must use these tools to reduce the net book value of, otherwise referred to as "accelerate" the cost recovery of, its stranded costs each year. Any positive difference under the report required by Section 39.257(b) shall be applied to the net book value of generation assets.[5]

The reference in this section to the 1998 report limits only *who* may use the chapter's tools. Nothing in the section freezes stranded costs at 1998 levels. When the Legislature intended to freeze utility figures at 1998 levels elsewhere in the statute, it did so expressly.[6] It did not do so here.

It is undisputed the 1998 report listed TXU as having stranded costs at that time. So applying section 39.254 to this case, the operative second sentence requires TXU to accelerate recovery of "its stranded costs each year."[7] The ambiguity is in these last five words-which stranded costs? Those that appeared to exist in 1998 or those that appear to exist now?

The PUC chose to use current estimates, and that is certainly the more rea-

---

3. *Pub. Util. Comm'n of Texas v. City Pub. Serv. Bd. of San Antonio,* 53 S.W.3d 310, 315 (Tex. 2001). In addition, the Legislature specifically granted the PUC authority to do anything "necessary and convenient" to the regulation of public utilities. TEX. UTIL.CODE § 14.001.

4. TEX. UTIL.CODE § 39.001(b)(1).

5. *Id.* § 39.254.

6. *See, e.g.,* TEX. UTIL.CODE § 39.302(5) (limiting "regulatory assets" to those reported by utilities in 1998 Form 10 K); *City of Corpus Christi v. Pub. Util. Comm'n of Texas,* 51 S.W.3d 231, 257 (Tex.2001) (holding PUC correctly refused to use updated figures for regulatory assets when statute froze them at 1998 levels).

7. TEX. UTIL.CODE § 39.254.

sonable construction. There is no reason to require accelerated recovery of stranded costs from previous years that no longer exist. Once its stranded costs were reduced to zero, TXU could not continue mitigation simply because it made more money that way. TXU's counsel conceded at oral argument that if TXU had sold its nuclear power plant in 1999 at book value, it could not continue recovering stranded costs under section 39.254. The same rule should apply when stranded costs disappear not due to a sale but to a rise in gas prices.

Nevertheless, TXU has continued to recover stranded costs in years when, according to the PUC, it had none. Section 39.255 of the statute allows a utility "that does not have stranded costs described in Section 39.254" to use excess revenues to improve transmission, distribution, or air quality facilities.[8] TXU has used its excess revenues for none of these. As a result, section 39.255 requires TXU to return these funds to consumers.[9] That is just what the PUC order does.

TXU argues the Legislature intended to freeze estimated stranded costs at 1998 levels (even though the statute never says so) because after the true-up proceeding in 2004 they will become "actual" rather than "estimated." But the true-up is likely to require just as many educated guesses as earlier estimates. Nuclear plants (the main source of stranded costs) rarely swap hands, and never in an open market. In lieu of an objective market price, the plants will be valued at the true-up using stock prices and anticipated income streams.[10] But stock prices reflect many factors other than the auction-value of the plants. And it will be impossible to tell whether income stream estimates are accurate until decades from now when the last kilowatt is sold. The Legislature certainly had the power to provide a cut-off date in 2004, after which all calculations would be treated as final. But that merely guarantees they are final; it cannot guarantee they are accurate.

The statute does not freeze stranded cost estimates at 1998 levels. It requires the PUC to update stranded cost estimates now,[11] and nowhere requires it to ignore the results. In a recent case involving the same statute, the same parties, and the same question—whether the PUC should use updated figures when the statute was unclear—this Court deferred to the Commission.[12] To be consistent, the Court must do the same here.[13]

### Section 39.201

Second, TXU argues the PUC has taken steps it has no power to take—at least not yet. For reasons both statutory and equitable, TXU dares not argue it can simply keep several billion dollars as a windfall. Instead, it points out that PURA section 39.201($l$) allows the PUC to take the steps it does here (reversing redirected depreciation and returning excess revenues to

---

**8.** *Id.* § 39.255(a).

**9.** *Id.* § 39.255(b).

**10.** *Id.* § 39.262(h), (i).

**11.** *See id.* § 39.201(g).

**12.** *See TXU Elec. Co. v. Pub. Util. Comm'n of Texas,* 51 S.W.3d 275, 286 (Tex.2001) (Owen, J., concurring).

**13.** TXU points out the PUC did not use updated figures consistently, refusing to update some figures that might have operated to TXU's benefit. It is hard to see why section 39.254 should be read broadly to favor updated figures, and yet section 39.201(h) should be read narrowly to preclude some updates merely because it mandates others. But as TXU admits, this issue is not before the Court in this proceeding.

consumers by lowering rates) after the true-up proceeding some years from now. Because of this express provision, TXU infers a legislative intent to prohibit their use any earlier.

But the Legislature did provide for some rate adjustment in the current proceedings based on updated stranded cost estimates. PURA section 39.201(g) allows the PUC to include a competition transition charge in 2002 rates based on current estimates of stranded costs.[14] TXU argues that, because the PUC's adjustment is a credit to consumers rather than a charge, it has improperly read a "negative competition transition charge" into the statute.

But TXU makes the same inference in its own reading of the statute, without saying so. TXU says section 39.201(*l*) allows the PUC to remedy overrecovery at the true-up, but that section only applies if "the competition transition charge is larger than is needed to recover any remaining stranded costs." It is undisputed TXU's rates will include *no* competition transition charge, and it will have *no* "remaining stranded costs" if it has overrecovered them. How then can this section apply, if the charge that is "larger than is needed" is zero? Only by reading the statute to imply a negative competition transition charge. There is nothing else zero can be "larger than."

TXU's argument shows all parties agree we must infer somewhere in chapter 39 the equivalent of a negative competition transition charge. The PUC's order has the

effect of doing do so in section 39.201(g); TXU would do so in section 39.201(*l*). There is no reason why the former is *ultra vires* if the latter is not.[15]

.

### Section 39.262(a)

The PUC relies on two other sections of the statute, both of which mandate general duties without providing specific means. First, it argues PURA section 39.262(a) absolutely prohibits any overrecovery of stranded costs:

> An electric utility, together with its affiliated retail electric provider and its affiliated transmission and distribution utility, may not be permitted to overrecover stranded costs through the procedures established by this section or through the application of the measures provided by the other sections of this chapter.[16]

TXU argues this section applies only to the true-up proceeding in 2004. But in the last clause of the rule, the Legislature said just the opposite—the section also applies to "the measures provided by the other sections of this chapter," including the current proceedings. TXU points to the location of this provision in a section titled "True Up Proceeding." The Legislature has categorically rejected such reasoning: "the heading of a ... section does not limit or expand the meaning of a statute."[17] And the Legislature's location of provisions in this statute cannot be conclusive (at least not contrary to the express words) because it is not always consis-

---

**14.** Tex. Util Code § 39.201(g).

**15.** TXU also suggests stranded costs may be recovered at the true-up pursuant to section 39.262(g). But that section applies only if the PUC determines that rates "are larger than needed to recover the transmission and distribution utility's costs." It makes no mention of stranded costs, and a transmission and distribution utility's costs would never be stranded, as it remains a regulated monopoly. Even if it did apply, the section would again require inferring a negative competition transition charge.

**16.** *Id.* § 39.262(a).

**17.** Tex. Gov't Code § 311.024.

tent.[18] The body of section 39.262(a) says it applies to all parts of chapter 39. Contrary to human anatomy, in statutory construction what's in the body governs, not what's in the head.

The PUC found TXU overrecovered stranded costs, and there is no denying it did so "through the application of the measures provided by the other sections of this chapter" (specifically sections 39.254 and 39.256). Because the statute says this "may not be permitted," it is hard to argue the statute prohibits the PUC from doing anything about it.

### Section 39.001

Second, the PUC relies on PURA section 39.001(b)(1), in which the Legislature requires it to implement deregulation in a way "that encourages full and fair competition among all providers of electricity."[19] The PUC found that doing nothing until 2004 might crush competition just as it starts. This is because TXU's overrecovery threatens to cancel a three-year advantage the Legislature provided for new competitors. Until 2005, the Legislature set a floor for TXU's retail rates and designated it the "price to beat."[20] By reversing overrecovery of stranded costs, the PUC's order pushes down transmission rates until then, and makes it easier for new competitors to do exactly what the price's name suggests.

But if transmission costs are kept artificially high until after the true-up is completed[21] (as TXU suggests), by that time TXU will no longer be bound to the price to beat.[22] The brief competitive advantage the Legislature intended for new competitors will never exist. Again, given this legislative mandate to encourage competition and an interim plan that prescribed a price advantage for new providers, it is hard to argue the statute requires the PUC to stand by while the "price to beat" becomes a "price that cannot be beat."

### The Necessary Implication

This brief overview of the relevant statutory provisions shows the Legislature could not have been clearer about what the PUC must do—it must promote competition and prohibit overrecovery of stranded costs. But the Legislature could have been clearer about how, at least in the current circumstances. There is no prescribed plan for the current situation; the Legislature prescribed the results it wanted, but left the means and timing unclear.

What should the PUC do when the Legislature gives it a mandate but no express authority to carry it out? The Court answered this question most recently in a case involving the same statute and many of the same parties. In *City of Corpus Christi v. Public Utility Commission of Texas*,[23] several parties challenged a "non-

---

**18.** For example, section 39.201(*l*) concerning the tools available at the true-up is located in the section concerning rate-setting for 2002. Conversely, section 39.262(b) concerning annual reports by certain utilities beginning in 2002 is located in the section concerning the true-up beginning in 2004.

**19.** TEX. UTIL.CODE § 39.001(b)(1).

**20.** *See id.* § 39.202.

**21.** The PUC proceeding at issue here began in March 2000, and a final order was not issued until eighteen months later. Even with this Court's prompt review by mandamus, numerous issues remain pending in the trial court, and the time needed to complete them and the inevitable appeals is anybody's guess. It would be wishful thinking to assume the true-up will proceed any faster.

**22.** *See* TEX. UTIL.CODE § 39.202(e).

**23.** 51 S.W.3d 231 (Tex.2001).

standard true-up" because the statute [24] did not expressly provide for reallocation among consumer classes. This Court rejected the challenge, relying on a more general section [25] allowing adjustments to utility rates (but not reallocation among classes) to ensure funds would be available to pay a utility's bonds.[26] The Court reasoned that the important purpose in the general policy permitted "minor and essential adjustments" not expressly permitted by the statute.[27]

The same applies here. The statutory adjustments the PUC adopted are minor-they implement powers the PUC clearly has, though arguably not yet. They are also essential if the PUC is to comply with the statute's mandatory policies in favor of competition and against overrecovery of stranded costs. If the Court was correct when it held the PUC could act by necessary implication to protect the viability of bonds and the interests of bondholders, surely the viability of competition and the interests of consumers deserve no less.

### Conclusion

No one knows the amount of TXU's stranded costs. After an eighteen-month proceeding involving scores of lawyers, experts, and computers, the PUC commissioners determined TXU had no stranded costs, and should not retain $1.7 billion for several years on the assumption that it did. They may be wrong, but under any theory of legislative delegation, it is their mistake to make.

**24.** *See* Tex. Util.Code § 39.253.

**25.** *See id.* § 39.307.

**26.** *City of Corpus Christi,* 51 S.W.3d at 268.

**27.** *Id.* at 268–70.

**1.** *See* Tex. Util Code § 39.001(b)(1) ("The legislature finds that it is in the public interest to: (1) implement on January 1, 2002, a com-

Justice HECHT, joined by Justice OWEN and Justice JEFFERSON, dissenting.

Tomorrow, January 1, 2002, retail markets for the sale of electricity in Texas will open for competition.[1] The development of those markets will be shaped profoundly and irreversibly by the charges to retailers set by the Public Utility Commission. The Commission has reduced these charges in some markets by ordering several incumbent utilities to reverse their efforts to mitigate and accelerate the recovery of the stranded costs they were estimated to have in 1998 because the Commission now estimates that those costs have since fallen. The Commission's authority to order this reversal is challenged by one utility, TXU Electric Company, in this original mandamus proceeding and by another, Reliant Energy, Inc., in a separate petition that is denied today.[2]

It is impossible to predict with any certainty how much utilities' stranded costs will be, or whether there will be any stranded costs at all, when they are finally determined in 2004. If the Commission's current estimates turn out to be close to accurate, then its reversal of mitigation efforts and consequent reduction in "wholesale" charges may prove beneficial to competition. But if in 2004 the Commission's 2001 estimates are found to be as far off the mark one way as it now thinks its 1998 estimates were off the other way, the lost opportunity to mitigate those costs

petitive retail electric market that allows each retail customer to choose the customer's provider of electricity and that encourages full and fair competition among all providers of electricity....").

**2.** *In re Reliant Energy, Inc.,* No. 01–1168 (Tex., filed Nov. 28, 2001, denied Dec. 31, 2001).

at this early stage may necessitate increased "wholesale" charges that will snuff out fledgling competition. Because the future is unknowable, the Commission has no justification for deviating from the Legislature's prescribed plan for the transition to competition.

The issue here is not whether stranded costs will be over-recovered or under-recovered. Utilities that are finally determined to have stranded costs will be entitled to recover only those costs and no more. The issue here is what will happen in the meantime. The reversal of early efforts to mitigate stranded costs is, in my view, a significant deviation from the statutory plan. It impacts millions of Texans and involves billions of dollars. Its effects on competition cannot be undone on appeal because competition will have long been underway by the time the case winds through the district court, court of appeals, and back here. The scope of the Commission's statutory authority is a legal issue which we must ultimately decide without deference to the lower courts' decisions. While the district court can stay the Commission's orders pending adjudication of the principal issue, this does not guarantee the parties full and timely relief; even if a stay were granted by January 1 or shortly thereafter, the almost certain appeals from that decision to the court of appeals and this Court could not possibly be completed for months, and still the substantive issue of the Commission's authority would remain.

The Commission chairman observed that this dispute will likely be moot before judicial review can be completed. The Court proves him right. Faced with similar exigencies—as in a redistricting case three months ago[3]—this Court has granted mandamus relief, and I would do so here. To refuse to rule, as the Court does today, not only denies relator any meaningful review of the Commission's decision; it denies the Commission, the many other parties intensely interested in the future of competition, and the public a final, timely answer.

I respectfully dissent.

### I

TXU invokes this Court's original jurisdiction under section 22.002(a) of the Government Code, which states:

> The supreme court or a justice of the supreme court may issue writs of procedendo and certiorari and all writs of quo warranto and mandamus agreeable to the principles of law regulating those writs, against a statutory county court judge, a statutory probate court judge, a district judge, a court of appeals or a justice of a court of appeals, or any officer of state government except the governor, the court of criminal appeals, or a judge of the court of criminal appeals.[4]

JUSTICE BAKER's concurring opinion argues that the jurisdiction conferred by this statute does not reach the Public Utility Commission itself, that TXU has not asked for relief against the three members of the Commission, and that TXU has named them as respondents merely as "a ruse,"[5] "purely to circumvent this Court's holdings".[6] Although this argument goes further than the Commission and its members have chosen to go, asserting only that the Court should not exercise jurisdiction, not that the Court does not have it, the

3. *Perry v. Del Rio,* 66 S.W.3d 239, 44 Tex. Sup.Ct. J. 1147 (Sept. 12, 2001).

4. TEX. GOV'T CODE § 22.002(a).

5. *Ante* at 141.

6. *Ante* at 139.

Court may raise jurisdictional issues on its own.[7] Accordingly, I begin by addressing the concurring opinion.

Ever since the Texas Constitution was amended in 1891, this Court has had original jurisdiction to issue writs of mandamus "in such cases as may be specified" by the Legislature, "except as against the Governor of the State."[8] In 1892 the Legislature enacted the statute that has become, with amendments that are not of concern here, section 22.002(a) of the Government Code, granting the Court power to mandamus "any district judge or officer of the state government".[9] The statute did not further specify what officers were meant. In enacting the statute, the Legislature made no reference to an 1881 statute providing that "[n]o court of this State"—including the Supreme Court—"shall have power, authority or jurisdiction to issue the writ of mandamus . . . against any of the officers of the executive departments of the government of this State".[10] This group of officers had also never been defined. The difference in the wording of the two statutes raised this question: did both refer to essentially the same group of officials so that the 1892 statute did no more than create a Supreme Court exception to the blanket prohibition in the 1881 law, or did the 1892 statute give the Court additional original jurisdiction, partially overlapping the district court's jurisdiction, to mandamus a broader group of "officers of the state government" besides the "officers of the executive departments" that the Supreme Court alone could mandamus?

The lack of any clear answer is reflected in the Court's early decisions construing the 1892 statute. In 1893, we held that the statute was a valid exercise of the Legislature's authority under the 1891 amendment to the Constitution.[11] In an opinion granting mandamus against the Comptroller of Public Accounts, Chief Justice Stayton observed:

> Some question may arise as to what officers are embraced in the words "officer of the state government;" but there can be no doubt that the comptroller of public accounts is a state officer; he is an officer in one of the departments of the executive branch of the state government, whose duties extend to the trans-

---

7. *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 445–446 (Tex.1993).

8. Tex. Const. art. V, § 3; *see* Tex. S.J. Res. 16, 22nd Leg., R.S., 1891 Tex. Gen. Laws 197 (approved April 28, 1891).

9. Act approved April 13, 1892, 22nd Leg., 1st C.S., ch. 14, § 1, art. 1012, 1892 Tex. Gen. Laws 19, 21, *reprinted in* 10 H.P.N. Gammel, The Laws of Texas 1822–1897, at 383, 385 (Austin, Gammel Book Co. 1898) (codified as Tex.Rev.Stat. art. 946 (1895), as Tex.Rev.Civ. Stat. art. 1526 (1911), and as Tex.Rev.Civ. Stat. art. 1733 (1925)) ("The supreme court, or any justice thereof, shall have power to issue . . . writs of quo warranto and mandamus against any district judge or officer of the state government, except the governor of the state.").

10. Act approved Feb. 15, 1881, 17th Leg., R.S., ch. 12, § 4, 1881 Tex. Gen. Laws 7, 7–8, *reprinted in* 9 H.P.N. Gammel, The Laws of Texas 1822–1897, at 99, 99–100 (Austin, Gammel Book Co. 1898) (codified as Tex.Rev.Stat. art. 4861 (1895), and as Tex.Rev Civ. Stat. art. 5732 (1911)) ("No court of this State shall have power, authority or jurisdiction to issue the writ of mandamus, or injunction, or any other mandatory or compulsory writ or process against any of the officers of the executive departments of the government of this State, to order or compel the performance of any act or duty, which, by the laws of this State, they or either of them are authorized to perform, whether such act or duty be judicial, ministerial or discretionary.").

11. *Pickle v. McCall*, 86 Tex. 212, 24 S.W. 265 (1893).

action of the business of that department throughout the entire state.[12]

The Court did not suggest that the two groups of officials described in the 1881 and 1892 statutes could be equated, but concluded only that the Comptroller was unquestionably in both groups.

In an 1895 decision, however, the Court implied that there might be some closer identity between the two groups.[13] Holding that the 1892 statute essentially created an exception to the 1881 statute only to the extent that the latter applied to this Court but not as it applied to other courts, we concluded that the 1881 statute should "be construed to read: 'No court of this state, except the supreme court, shall have power,' etc."[14]—the "etc.", of course, including "to ... mandamus ... officers of the executive departments". We did not hold that the 1892 statute was nothing more than an exception to the 1881 statute, but neither did we indicate that the 1892 statute was broader.

Just as easily as the Court concluded that it had original jurisdiction to mandamus the Comptroller, it also held in an 1897 case that it had no such jurisdiction to mandamus a county treasurer, even though he was in some sense an officer of state government.[15] We explained:

> Counties are but political subdivisions of the state, and most of the officers of a county perform functions for the state, and are, in a certain sense, state officers.

But it does not follow that they are "officers of the state government," within the meaning of the [1892 law]. If it had been the intention of the legislature to confer jurisdiction upon this court to grant the writ of mandamus against any state officer, using those words in their widest sense, it would not have been necessary to provide expressly that the court might issue the writ against any district judge. The mention of that officer clearly shows that it was not the purpose to include within the meaning of the term "officers of the state government" any other officer of a district, and, for a stronger reason, such officers as are commonly known as county officers.[16]

The Court next revisited the issue in 1903 in *Betts v. Johnson*.[17] The relator in that case petitioned for mandamus directing the Board of Eclectic Medical Examiners to issue him a license to practice medicine. The Board was one of three physician-licensing agencies that the Legislature had created two years earlier[18] under the authority of article XVI, section 31 of the Texas Constitution, which authorized licensing but prohibited giving "preference ... to any school of medicine."[19] It appears that three licensing boards were necessary because physicians trained in one of the schools of medicine then prevalent—allopathic, homeopathic, and

12. *Id.* at 266.

13. *McKenzie v. Commissioner of Gen. Land Office,* 88 Tex. 669, 32 S.W. 1038 (1895).

14. *Id.* at 1039.

15. *Travis County v. Jourdan,* 91 Tex. 217, 42 S.W. 543 (1897).

16. *Id.* at 543 (citations omitted).

17. 96 Tex. 360, 73 S.W. 4 (1903).

18. Act approved Feb. 22, 1901, 27th Leg., R.S., ch. 12, 1901 Tex. Gen. Laws 12, *reprinted in* 11 H.P.N. GAMMEL, THE LAWS OF TEXAS 1897–1902–12 (Austin, Gammel Book Co.1902).

19. TEX. CONST. art. XVI, § 31 ("The Legislature may pass laws prescribing the qualifications of practitioners of medicine in this State, and to punish persons for mal-practice, but no preference shall ever be given by law to any school of medicine.").

eclectic—had so little regard for physicians trained in either of the other schools that no single group could be trusted to license all physicians without violating the anti-preference provision of the Constitution. Each board was comprised of nine members "learned in medicine and surgery", appointed by the Governor for two-year terms.[20] Their duty was to meet "at least twice a year at such times and places as the boards may from time to time determine" to "examine all persons making application to them who shall desire to commence the practice of medicine, surgery, [or] midwifery".[21]

To decide whether the members of the one board were "officers of the state government" within the meaning of the 1892 statute, we began by noting:

> The words "officers of the state government" are of a very indefinite meaning. All county and district officers are officers of the state government in a general sense, but we have held that they are not such within the meaning of the statute in question. Whether every officer of the state whose functions are not confined to a political subdivision of the state comes within the meaning of the terms, we have never decided. It would seem, however, that it was the purpose of the Legislature to include only such state officers as are charged with the general administration of state affairs, namely, the heads of the state departments.[22]

Such heads of departments were beyond the district court's mandamus jurisdiction because of the 1881 statute. Any broader grant of jurisdiction to this Court, we reasoned, would unnecessarily overlap the district court's jurisdiction and increase the caseload of an already overworked Supreme Court.[23] Thus, we concluded:

> We can see a reason why the court should have been empowered to grant writs of mandamus against the heads of the departments of the state government. These officers must reside, and their offices must be kept, at the seat of the state government, and their official functions are to be performed there. A mandamus proceeding against the head of a department, as a rule, involves questions which are of general public interest and call for a speedy determination. That they are of far more importance than those ordinarily arising in mandamus suits against other officers, whether of the state, or of a district, or a county, is, as we think, obvious.

> We fail to see any very good and sufficient reason why the Legislature should have deemed it appropriate to confer original jurisdiction upon this court to grant a writ of mandamus against executive officers, other than those intrusted with the general administration of state affairs and who exercise general governmental functions. Others are officers in a certain sense, but in another sense they are mere agents charged with the performance of special functions. The district courts have jurisdiction to issue the writ of mandamus to all other officers except heads of departments, and, as in other cases, appeals are allowable for the correction of the errors of those tribunals. Therefore we think the Legislature might have well considered that it was

---

20. Act approved Feb. 22, 1901, 27th Leg., R.S., ch. 12, §§ 2 3, 1901 Tex. Gen. Laws 12, 12–13, *reprinted in* 11 H.P.N. GAMMEL, THE LAWS OF TEXAS 1897–1902 12, 12–13 (Austin, Gammel Book Co.1902).

21. *Id.* §§ 4–5, at 13.

22. *Betts,* 73 S.W. at 4–5 (citation omitted).

23. *Id.*

neither necessary nor proper to give the Supreme Court jurisdiction to issue the writ of mandamus against such officers.[24]

Clearly, the members of the Board of Eclectic Medical Examiners were in this latter category. Although they licensed physicians to practice anywhere in the State, those physicians were from only one school of medicine (which no longer exists).[25] The board did not have offices in Austin and was required to meet only twice a year. It is perhaps some measure of the board's lack of importance that it was abolished only six years after it was created.[26] For these reasons, the members of the board were not within the mandamus jurisdiction conferred by the 1892 statute.

Neither was the board itself, as the Court's opinion explained in closing:

> But the writ applied for in this case is against a board of officers, and not against an officer. It seems that, if it had been the purpose to empower this court to issue the writ as well against a board of officers as against a single officer, the language would have been, "any officer or board of officers of the state government." [27]

Justice Baker reads this part of the opinion to foreclose this Court from granting mandamus relief against multiple members of the same governmental entity, as opposed to a single officer heading an agen-

cy, when the decision complained of is that of the entity, but his view is inconsistent with the Court's decision in *McFall v. State Board of Education*,[28] the next case to construe the 1892 statute. There, relator petitioned the Court to mandamus the State Board of Education—a three-member board composed of the Governor, the Comptroller of Public Accounts, and the Secretary of State-to vacate one of its orders.[29] Chief Justice Gaines, who had written the Court's opinion in *Betts*, also wrote the opinion in *McFall*. Referring to the language just quoted from *Betts*, he explained:

> We held in effect in [*Betts*] that, because the board was a state board, it did not make them state officers within the meaning of the [1892 statute]. But it was held in that case that none of the board were state officers. But the statute does not authorize us to issue the writ of mandamus against the Governor of the state. The writ must go against all or none, and therefore cannot properly issue in this case.[30]

The Court thus expressly contemplated that mandamus could issue against the several members of a board—"[t]he writ must go against all"—as long as each of them was a state officer within the meaning of the 1892 statute. The reason the Court gave for denying mandamus in *McFall* was not because relief had been sought against a board rather than an

---

24. *Id.* at 5.

25. *See* Stedman's Medical Dictionary 441 (5th Unabridged Lawyers' Ed.1982) (defining "eclecticism" as "[a] now defunct system of medicine that advocated use of indigenous plants to effect specific cures of certain signs and symptoms").

26. Act of April 17, 1907, 30th Leg., R.S., ch. 123, § 17, 1907 Tex. Gen. Laws 224, 228, *reprinted in* 13 H.P.N. Gammel, General Laws of the State of Texas 224, 228 (1907).

27. 73 S.W. at 5 (citation omitted); *see also A & T Consultants, Inc. v. Sharp*, 904 S.W.2d 668, 684 (Tex.1995) (Hecht, J., dissenting).

28. 101 Tex. 572, 110 S.W. 739 (1908).

29. *Id.* at 740.

30. *Id.* at 739–740.

officer, or because the board had three members rather than a single head, but because not all of the board members were subject to the Court's mandamus jurisdiction. The Court held that it could not mandamus some of the members, even a majority, if it could not mandamus them all. Relator's remedy to challenge the validity of the board's decision, we said, was to petition the district court for mandamus relief against a lesser school official charged with the duty to carry out the decision.[31] But we did not suggest that the availability of this remedy was a reason to deny mandamus relief. The Court's only basis for denying relief was that the Governor, one of the board members, was beyond the Court's mandamus jurisdiction.

JUSTICE BAKER's position is also contradicted by three other decisions of this Court. In one, *Middlekauff v. State Banking Board,* the relator petitioned the Court to mandamus the board and others to pay a claim made against the bank depositors' guaranty fund.[32] The Court ordered "that this suit be dismissed as to the respondents no longer in office, and that a writ of mandamus be issued against the remaining respondents, requiring the allowance of the claim of relator out of the bank guaranty fund."[33] Although it is not clear from the Court's opinion exactly what offi-

cials were mandamused, the guaranty fund was controlled and managed by the three-member State Banking Board,[34] so that relief would have been effective only if directed against the members of the board then in office. Consistently, in *State Banking Board v. Winters State Bank,* the Court held that mandamus against the three-member State Banking Board and the State Banking Commissioner, a member of the board, was the proper means of enforcing a claim against the guaranty fund.[35] In a third case, *State v. Thomas,* the Court granted mandamus relief in a petition filed against the members of the Public Utility Commission.[36] JUSTICE BAKER argues that *Thomas* was an "aberration" and "wrongly decided"[37] because relator sought relief against the individual commissioners and the Court granted relief against the Commission,[38] but this is a technical flaw immaterial to the scope of the Court's original mandamus jurisdiction. The effect would have been the same had the Court granted relief against the commissioners instead of the Commission. The Court's mistake in the rendition of judgment does not detract from its decision to grant relief against the state officers it clearly determined were within its original mandamus jurisdiction.[39]

31. *Id.* at 740.

32. 111 Tex. 561, 242 S.W. 442, 442 (1922).

33. *Id.* at 443.

34. *See* TEX.REV.CIV STAT. art. 482 (1911); *see also, e.g., Guaranty State Bank of Graham v. Neill,* 275 S.W. 198, 199 (Tex.Civ.App.-Fort Worth 1925) (quoting article 482); *Chapman v. Guaranty State Bank,* 259 S.W. 972, 974 (Tex.Civ.App.-Fort Worth 1924) (stating that the guaranty fund was "wholly within the control of the state banking board"); *State Banking Bd. v. Pilcher,* 256 S.W. 996, 1004 (Tex.Civ.App.-Dallas 1923)(stating that the guaranty fund was "under the control and management of the state banking board"),

*rev'd on other grounds,* 270 S.W. 1004 (Tex. Com.App.1925, judgment adopted).

35. 13 S.W.2d 391, 393 (Tex.Civ.App.-Austin 1929, writ ref'd); *see also Chemical Bank & Trust Co. v. Falkner,* 369 S.W.2d 427 (Tex. 1963) (allowing mandamus against the State Banking Commissioner).

36. 766 S.W.2d 217 (Tex.1989).

37. *Ante* at 140.

38. *Ante* at 139–40.

39. *See also Cathey & Carrell v. Terrell,* 121 Tex. 130, 45 S.W.2d 956 (1932) (denying

The issue regarding the scope of the 1892 statute was partially resolved by the Legislature in its 1925 statutory recodification. That recodification no longer included the 1881 statute but did include, as article 1735, a provision giving the Supreme Court exclusive mandamus jurisdiction over "officers of the executive departments". In effect, the Legislature made its 1892 enactment an exception to the 1881 statute, consistent with our construction of the two statutes. The provision is now section 22.002(c) of the Government Code.[40] But the Legislature also recodified as article 1733 a separate grant of original mandamus jurisdiction to the Court over any "officer of state government", which is the predecessor to what is now section 22.002(a) of the Government Code. Thus, the Legislature treated the two groups of officials described in the two statutes as different. The Court has indicated that the "officers of the executive departments" over which it has exclusive original mandamus jurisdiction is a very restricted group.[41] It follows that the Legislature intended that the "officer[s] of state government" over whom the Court has original mandamus jurisdiction be a broader category of officials.

Whether an official should be included in that category is determined by considerations like those set out in *Betts*, including the "general public interest" in the offi-

cial's decisions, the necessity of a "speedy determination" of whether those decisions were according to law, and the "importance" of those decisions to the State as a whole.[42] By any measure, the members of the Public Utility Commission easily pass each of these tests. The Commission is a major state agency with "the general power to regulate and supervise the business of each public utility within its jurisdiction".[43] The Commission is composed of three commissioners appointed by the Governor with the advice and consent of the Senate.[44] Virtually all of their decisions impact the State as a whole, are of general concern, and require prompt review, but this is unquestionably true of their decisions regarding deregulation of the sale of electricity. Other states' experiences in moving toward the same goal, most recently California's, vividly prove the enormity of the consequences of such decisions. The Public Utility Commission is not the Board of Eclectic Medical Examiners.

This view of the scope of the Court's original jurisdiction to mandamus state officers is not inconsistent with any of this Court's decisions that JUSTICE BAKER cites. In one, *Superior Oil Co. v. Sadler*, the Court construed only its exclusive jurisdiction over "officers of the executive departments" and held that it could not manda-

---

without prejudice mandamus relief directing the members of the Railroad Commission to rule in a proceeding on the ground that the members had not been shown to have unreasonably delayed their ruling, but suggesting that relief would be granted if a ruling were unreasonably delayed).

**40.** TEX. GOV'T CODE § 22.002(c) ("Only the supreme court has the authority to issue a writ of mandamus or injunction, or any other mandatory or compulsory writ or process, against any of the officers of the executive departments of the government of this state to

order or compel the performance of a judicial, ministerial, or discretionary act or duty that, by state law, the officer or officers are authorized to perform.").

**41.** *City of Arlington v. Nadig*, 960 S.W.2d 641, 642 (Tex.1997) (per curiam).

**42.** *Betts*, 73 S.W. at 5.

**43.** TEX. UTIL.CODE § 14.001.

**44.** *Id.* § 12.051.

mus the School Land Board.[45] Even if the Court had considered whether the members of that board were state officers within the Court's non-exclusive mandamus jurisdiction, it is apparent even from the Court's brief *per curiam* opinion that the board's decision—not to accept a bid on an oil and gas lease—was not an issue of statewide interest or importance. In the other two cases that JUSTICE BAKER cites, *Givens v. Woodward*[46] and *McLarty v. Bolton*,[47] and one which he does not, *Malone v. Rainey*,[48] the Court held without discussion that its original mandamus jurisdiction did not extend to routine decisions of university boards. In none of these cases did the Court refuse to exercise its mandamus jurisdiction over officials of the stature of members of the Public Utility Commission.[49]

JUSTICE BAKER argues that TXU is not entitled to relief against the individual commissioners because the concluding paragraphs in TXU's petition and brief request relief only against the Commission and not against its members. But TXU's petition identifies the three commissioners as respondents, and obtaining relief against them is the manifest plea throughout the papers it has filed here. For example, TXU argues in its brief that "the PUC Commissioners are indisputably within the Court's mandamus power" under both section 22.002(a) and 22.002(c). In its reply to the responses to its petition, TXU states:

> the PUC Commissioners exercise extensive control over the intensely regulated electric power industry and exercise the sovereign functions of government for the protection and benefit of the public.

They are state officers and are subject to this Court's original mandamus jurisdiction. The only question is whether that jurisdiction should be exercised. Since, as detailed below, the Commissioners abused their discretion and there exists no adequate remedy at law, mandamus should issue.

TXU also argues that "[t]he Commission itself is ... also subject to that jurisdiction." Fairly read, TXU's prayer for relief against the Commission is only a shorthand reference to the agency and its members and not a retraction of its arguments relating to the commissioners. JUSTICE BAKER's argument unfairly takes two sentences from the prayer in TXU's petition and brief out of context.

JUSTICE BAKER also argues that to hold the Court's original mandamus jurisdiction applicable to this case will open the floodgates to petitions for mandamus against other state boards and commissions. I doubt whether this prediction will prove correct, but even if it does, granting relief in this one very extraordinary case will not spell the demise of the ordinary process for judicial review of ordinary administrative decisions. Nor will the Court's resources be strained in turning away ordinary cases. Unmeritorious petitions are not that hard to deny.

For these reasons, I conclude, as the Court does, that we have jurisdiction to mandamus the members of the Commission as TXU requests. I now turn to whether TXU has met the two conditions for obtaining relief.

## II

One thing TXU must show to obtain mandamus relief is that the members of

---

**45.** 458 S.W.2d 55 (Tex.1970) (per curiam).

**46.** 196 S.W.2d 456 (Tex.1946) (per curiam).

**47.** 191 S.W.2d 850 (Tex.1946) (per curiam).

**48.** 133 S.W.2d 951 (Tex.1939) (per curiam).

**49.** *See also In re Nolo Press/Folk Law, Inc.*, 991 S.W.2d 768, 775–776 (Tex.1999).

the Commission clearly abused their discretion.[50] Their failure to correctly construe the Public Utility Regulatory Act (PURA)[51] would be such a clear abuse of discretion.[52]

As the Court has said before, the Public Utility Commission "is a creature of the Legislature and has no inherent authority."[53] Like other state administrative agencies, the Commission "has only those powers that the Legislature expressly confers upon it" and "any implied powers that are necessary to carry out the express responsibilities given to it by the Legislature."[54] It is not enough that the power claimed by the Commission be reasonably useful to the Commission in discharging its duties; the power must be either expressly conferred or necessarily implied by statute. The Commission claims no express statutory authority to reverse stranded cost mitigation efforts before the 2004 true-up, when stranded costs will be finally determined,[55] and no such authority exists. The issue, then, is whether the authority asserted by the Commission is *necessarily* implied in PURA. To resolve this issue, one must begin with a basic understanding of stranded costs. The Court has thoroughly explored the matter of stranded costs in two cases last Term.[56] Here I

review only those considerations most important to the issues currently raised.

In a deregulated, competitive market for the sale of retail electricity, it is possible that some incumbent utilities' generation—related assets—principally nuclear power plants-will be worth less than their book value based on the historic costs of those assets in the regulated monopoly that has existed until now.[57] One reason is that it may be possible to generate electric power more economically using other fuels, such as natural gas.[58] This "positive excess of the net book value of generation assets over the market value of the assets", referred to as ECOM, is what PURA defines as "stranded costs".[59] PURA provides that "[a]n electric utility is allowed to recover all of its net, verifiable, nonmitigable stranded costs incurred in purchasing power and providing electric generation service",[60] but that "[a]n electric utility, together with its affiliated electric provider and its affiliated transmission and distribution utility, may not be permitted to overrecover stranded costs".[61]

The trouble is, whether a utility will have stranded costs in a competitive market, and how much they will be, depends largely on what the retail price of electricity will be in that as yet nonexistent market, which in turn depends on ever-chang-

**50.** *See Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992).

**51.** Tex. Util.Code §§ 11.001 et seq.

**52.** *See Walker*, 827 S.W.2d at 840.

**53.** *Public Util. Comm'n v. GTE-Southwest, Inc.* 901 S.W.2d 401, 407 (Tex.1995).

**54.** *Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 315 (Tex.2001).

**55.** Tex. Util.Code § 39.262.

**56.** *City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231 (Tex.2001); *TXU*

*Elec. Co. v. Public Util. Comm'n*, 51 S.W.3d 275 (Tex.2001).

**57.** Public Utility of Texas, *Report to the Texas Senate Interim Committee on Electric Utility Restructuring–Potentially Strandable Investment (ECOM) Report: 1998 Update*, at 1–3 (April 1998).

**58.** *Id.* at 3.

**59.** Tex. Util.Code § 39.251(7).

**60.** *Id.* § 39.252(a).

**61.** *Id.* § 39.262(a).

ing variables like natural gas prices.[62] In 1996, the Commission began using an ECOM administrative computer model to estimate what stranded costs would be in a deregulated market.[63] In 1998, the Commission reported to the Legislature that utilities' stranded costs were estimated to be about $3.3 billion if competition began in 2002.[64] But the Commission cautioned that actual stranded costs, based on market values rather than an administrative model, might be far more or far less than estimated, and might not even exist at all.[65] For example, the Commission estimated that TXU's stranded costs would be about $1.1 billion, although they might be as high as nearly $5 billion or as low as a negative $3.5 billion.[66] By a negative number, the Commission meant that the market value of a utility's generation-related assets would exceed book value, rather than vice versa, by that amount.

The Commission's 1998 report to the Legislature recommended that stranded costs be finally determined using actual market values rather than any administrative approach.[67] The Legislature agreed and required that determination to be made in 2004, after competitive markets have begun to develop.[68] One of the principal mechanisms for recovering stranded costs is a "competition transition charge" (CTC) to be incorporated in the "wholesale" rates charged by the transmission and distribution utility (TDU) and passed through to retail customers.[69] The CTC is to be based on estimated stranded costs when competition begins January 1, 2002,[70] and later on the final determinations made in 2004.[71]

But recovery of stranded costs solely through the CTC may be detrimental to consumers. The Commission warned in its 1998 report to the Legislature that retail competition would be impaired if recovery of stranded costs were delayed and that therefore early efforts to mitigate such costs were essential:

> If retail competition begins without some degree of prior ECOM mitigation, the time necessary to recover any applicable stranded costs may be extended, and the benefits of competition for consumers may be unnecessarily delayed. (*This appears to be the case in California—particularly for smaller consumers with less flexibility and fewer competitive alternatives.*)[72]

To avoid this danger, the Legislature required in PURA section 39.254 that utilities estimated in the Commission's 1998 report to have stranded costs mitigate those costs before January 1, 2002 by making certain accounting adjustments:

> Each utility that was reported by the commission to have positive "excess costs over market" (ECOM) denoted as the "base case" for the amount of stranded costs before full retail competition in 2002 with respect to its Texas jurisdiction, in the April 1998 Report to the Texas Senate Interim Committee on Electric Utility Restructuring entitled

62. *Report, supra* note 57, at 3.

63. *Id.* at 3–7.

64. *Id.* at 5.

65. *Id.*

66. *Id.* at 36.

67. *Id.* at 11.

68. Tex. Util. Code § 39.262.

69. *Id.* §§ 39.201, 39.262.

70. *Id.* § 39.201.

71. *Id.* § 39.262.

72. *Report supra* note 57, at 2 (emphasis added).

"Potentially Strandable Investment (ECOM) Report," *must* ... reduce the net book value of, otherwise referred to as "accelerate" the cost recovery of, its stranded costs each year.[73]

This mitigation is to be done by applying excess earnings to reduce the book value of generation assets.[74] PURA also gives utilities the option of "redirect[ing] all or a part of the depreciation expense relating to transmission and distribution assets to its net generation plant assets." [75] Section 39.256(c) of PURA requires that such accounting adjustments "shall be accepted and applied by the commission for establishing net invested capital and transmission and distribution rates for retail customers in all future proceedings." [76] The Commission continues to recognize the importance of early stranded cost mitigation, stating in the course of the proceedings now before the Court: "The early mitigation and recovery are intended to minimize any detrimental impacts on the developing competitive retail electric market that the recovery of large amounts of stranded costs may have." [77]

TXU began using both of these mitigation tools—reapplying excess earnings and redirecting depreciation—as soon as it was permitted by PURA to do so. In March 2000 each utility, including TXU, initiated a proceeding in the Commission as required by PURA [78] to establish a business plan for unbundling its generation, transmission and distribution, and retail services, and to set rates for its proposed TDU. In the course of those proceedings to determine the appropriate initial CTC, the Commission revised its ECOM admin-

istrative model and used it to re-estimate utilities' stranded costs, using current data as PURA requires.[79] The Commission found that TXU's estimated stranded costs were no longer $1 billion but negative $2.745 billion. Based on this finding, the Commission determined that no CTC should be set for TXU's TDU. However, the Commission went further and ordered that the TDU's rates should be reduced by reversing the redirection of $798 million on TXU's books and refunding TXU's reapplication of $888 million excess earnings through an "excess mitigation credit" (EMC) to be passed through to consumers. The Commission made similar determinations with respect to other utilities.

As I said at the start of this discussion, the Commission claims no express statutory authority for its order reversing TXU's mitigation efforts. The Commission argues that PURA is silent on the subject of mitigation reversal because the Legislature never contemplated that utilities estimated in the Commission's 1998 report to have stranded costs would later see those costs disappear, largely due to much higher natural gas prices that make nuclear plant generation of electricity more economic. But this argument is undercut, not supported, by the 1998 report, which specifically cautioned that stranded costs could fall anywhere within a very wide range of both positive and negative numbers. Furthermore, PURA itself recognizes that stranded costs might be nonexistent by 2001, whether due to mitigation efforts or changed circumstances, and therefore requires a calculation of the

**73.** Tex. Util.Code § 39.254 (emphasis added).

**74.** *Id.*

**75.** *Id.* § 39.256(a).

**76.** *Id.* § 39.256(c).

**77.** Order on Certified Issues in Docket No. 22350 at 9 (Nov. 9, 2000).

**78.** Tex. Util.Code § 39.201.

**79.** *Id.* § 39.201(h).

CTC, "*if any,*" based on current information.[80] The words, "if any", strongly suggest that the Legislature contemplated that, due to fluctuations in model inputs to estimate stranded costs and the success of mitigation efforts, it was possible, perhaps even likely, that a CTC would not be necessary because the utility would have no positive estimated stranded costs in 2002. Thus, if the 1998 report and statutory language reflect legislative intent, it seems much more likely that PURA does not authorize the Commission to reverse stranded cost mitigation efforts because the Legislature did not want to risk the impacts on developing competition that, according to the report, delayed recovery of stranded costs could have. But whatever the explanation, PURA does not give the Commission express authority to reverse early mitigation efforts. The Commission is thus left to argue that such authority is necessarily implied in the statute.

The Commission points to three provisions. One is section 36.003(a) of PURA, which requires the Commission to "ensure that each rate an electric utility or two or more electric utilities jointly make, demand, or receive is just and reasonable." [81] As the PUC's argument goes, if depreciation on transmission-and-distribution-related assets is unnecessarily redirected to generation-related assets, the book value of the former, on which a TDU's rates are based, is increased unjustly and unreasonably. While this argument clearly has merit, the power to correct rates by mitigation reversal is far too specific to be necessarily implied by the power to set just and reasonable rates. To read section 36.003(a) as the Commission does would be to give the Commission essentially unlimited authority to do whatever it thought "just and reasonable", reducing to no more than mere suggestions the Legislature's detailed requirements for the transition to a competitive retail market. Moreover, the evidence before the Commission does not show that wholesale rates will be just and reasonable only if early mitigation efforts are now reversed; to the contrary, the evidence is quite clear that the results of such reversal cannot be predicted with any reliability, any more than 2004 stranded costs could be predicted in 1998. Simply put, no one knows, or can know, whether a reversal of stranded cost mitigation is necessary to ensure just and reasonable rates, or whether the opposite is true.

Another statutory provision on which the Commission relies for its power to reverse mitigation of stranded costs is section 39.201(h), which requires the Commission to update the data inputs into its ECOM administrative model in determining a TDU's wholesale charges beginning in 2002.[82] Why, the Commission asks, would the Legislature require stranded cost estimates to be updated before 2002 if it did not intend for the Commission to act on them by reversing early mitigation efforts? The history of PURA's enactment provides no answer. Logically, the Legislature could well have decided that updated stranded cost estimates should be used in setting the CTC to be incorporated in wholesale rates but not in determining whether early mitigation efforts should have been used. This middle course reduces the risks of both over-recovery and under-recovery of stranded costs before the 2004 true-up, thereby protecting competition from excessive wholesale rates both as it first emerges and as it later struggles to gain ground. The obvious

---

80.   *Id.* § 39.201(d),(g), & (h).

81.   *Id.* § 36.003(a).

82.   *Id.* § 39.201(h).

rationality of this approach, based on risks not only consistently identified by the Commission in its 1998 report as well as in the current proceedings, but also reflected in PURA itself, prevents a necessary inference from section 39.201(h) that the Commission must be empowered to reverse mitigation.

The only other provision on which the Commission relies is section 39.262(a), which provides

An electric utility, together with its affiliated retail electric provider and its affiliated transmission and distribution utility, may not be permitted to overrecover stranded costs through the procedures of this section or through the application provided by the other sections of this chapter.[83]

According to the Commission, this section qualifies every other part of PURA, including the requirement in section 39.254 that utilities with estimated stranded costs in 1998 undertake to mitigate them before any CTC charge is set, and gives the Commission not only the power but the duty to prevent over-mitigation. But even assuming that the Commission is correct that this provision in effect trumps all others, it cannot be invoked before 2004, when stranded costs are finally determined. The subject of section 39.262, entitled "True Up Proceeding", is the 2004 true-up proceeding, not any interim determinations. More importantly, to date stranded costs have only been, and can only be, estimated. In 1998, those estimates compelled the early mitigation efforts TXU and others undertook in order to minimize adverse effects on competition in 2004. Estimates in 2000, based on much higher natural gas prices, showed that those mitigation efforts might not

have been necessary. Now, natural gas prices have fallen again, and if the proceedings before us were reopened, mitigation might once again appear to be the wiser course. There is every reason to believe that 2002 and 2003 will only bring more changes in the estimates. Revisions to the ECOM administrative model and variations in its data input necessarily produce stranded cost estimates that are kaleidoscopic; no fixed view of stranded costs can be formed until the 2004 true-up, when real, market values are available. Even then, stranded costs will be only a judgment call, albeit one mandated by the Legislature.

It makes sense for PURA to require that stranded costs cannot be over-recovered in the final analysis; otherwise, utilities would receive a windfall from deregulation. It makes far less sense to argue for shifting mitigation efforts in the meantime. The Legislature may well have considered that the development of a competitive market requires more stability with adjustments made only at prescribed times. Yet as the Commission construes its power under section 39.262(a), it could keep on readjusting mitigation efforts back and forth until 2004. The Commission made that very assertion earlier in the administrative proceedings we are reviewing, stating that its power to review stranded cost mitigation "is not limited in time or by method."[84] Now before this Court, the Commission has retreated to a more limited view of its statutory authority, refusing to argue, although invited to do so by other parties in the proceeding and questioned on the subject by the Court in oral argument, that it can revisit mitigation efforts in 2002 or 2003. But while the Commission refuses to make this argument, it concedes that its construction

83. *Id.* § 39.262(a).

84. Order on Certified Issues in Docket No. 22350 at 9 (Nov. 9, 2000).

of section 39.262(a) to empower monitoring of stranded cost recovery knows no logical bounds. Nothing in PURA suggests such a role for the Commission.

The Commission's claim of authority to reverse mitigation efforts is readily contrasted with its claim of authority to utilize a non-standard true-up to protect the security and payment of transition bonds which we upheld last Term in *City of Corpus Christi v. Public Utility Commission*[85] and *TXU Electric Co. v. Public Utility Commission*.[86] Section 39.307 of PURA authorizes the Commission "to ensure the expected recovery of amounts sufficient to timely provide all payments of debt service and other required amounts and charges in connection with the transition bonds."[87] No party to the proceedings reviewed in those cases questioned that absent some adjustment in the allocation of transition costs to various classes of customers, those costs would force customers in at least one class to look elsewhere for affordable electric service, and without anyone left to pay that part of the transition bond obligations, the security and payment of the bonds would be impaired. This was not a risk; it was a certainty. Although PURA did not expressly provide for inter-class reallocations of transition costs, the Court had little difficulty in concluding that the Commission's power to order such adjustments was necessarily implied under section 39.307 to prevent the entire securitization scheme set out by the statute from failing. The parties in *City of Corpus Christi* and *TXU* disagreed only on the means chosen by the Commission to remedy the problem—the non-standard true-up; they did not disagree that some remedy was necessary. By contrast, what is certain in the proceedings now before us is not that over-mitigation will collapse the statutory scheme; rather, what is certain is that the effects of over-mitigation cannot be known. Absent Commission authority to order something like a non-standard true-up, the statutory securitization process central to deregulation was doomed to failure; absent Commission authority to order reversal of mitigation, no one knows whether the competitive market will be better off or worse off. PURA necessarily implies that the Commission has the power to save the deregulation scheme from certain failure; it does not necessarily imply that the Commission has the power to tweak the scheme in ways that may as likely prove harmful as beneficial.

It is important to emphasize that over-mitigation of stranded costs will not result in over-recovery, any more than under-mitigation will result in under-recovery. The purpose of mitigation is simply to minimize the effects of stranded cost recovery in 2004. PURA expressly provides that a utility "is allowed to recover all of its net, verifiable, nonmitigable stranded costs"[88] and "may not be permitted to overrecover stranded costs".[89] TXU and the Commission agree that sections 39.201($l$) and 39.262(g) of PURA expressly give the Commission ample tools to fully correct any over-recovery of stranded costs shown in the 2004 true-up to have resulted from mitigation efforts. This is the plain import of these provisions.

The effect of the Commission's reversal of TXU's mitigation efforts should be to reduce the TDU's rates, thereby widening

---

85. 51 S.W.3d 231 (Tex.2001).

86. 51 S.W.3d 275 (Tex.2001).

87. Tex. Util.Code § 39.307; *City of Corpus Christi*, 51 S.W.3d at 268.

88. Tex. Util.Code § 39.252(a).

89. *Id.* § 39.262(a).

the margin between a potential retailer's wholesale costs and the "price to beat"[90] that an incumbent utility's related retail provider must charge for several years, and thus encouraging competition in 2002. But even if that is the immediate effect of the Commission's decision, the risk is that when a CTC is set in 2004 to achieve full recovery of stranded costs within a reasonable period of time, it will be so high that fledgling competition will be stifled when it otherwise would have survived. The purpose of mitigation, urged by the Commission in its 1998 report, is to minimize that risk. The decision whether to incur the risk was the Legislature's to make, and it chose not to do so. The Commission is not authorized to redetermine the issue.

Finally, it bears mention that the Legislature was asked this past session in H.B. 2107 to amend PURA to give the Commission the power to reverse mitigation efforts before 2004, and the Legislature refused to do so.[91] Bills fail for many reasons other than legislative rejection of proposals on their merits; hence, one cannot read very much into the failure of H.B. 2107 to pass. While the demise of H.B. 2107 does not weigh much against the Commission's argument here, it certainly adds nothing in support of the argument.

JUSTICE BRISTER accepts the Commission's argument. In my view, his concurring opinion contains two basic flaws. One is that he assumes that more is now known about TXU's stranded costs than was known in 1998. TXU's stranded costs "no longer exist[ ]", he says; they have been "reduced to zero", they have "disappear[ed]".[92] This is simply is not true. Two important things have changed since 1998: the Commission has modified its administrative ECOM model for estimating stranded costs—it changed the formula, in other words—and the price of natural gas has risen. But neither of these things, nor anything else that has happened, has improved the accuracy of stranded cost predictions. The present proceedings have produced exactly what the Commission's 1998 report contained: an *estimate*. TXU's stranded costs, if any, have not any more disappeared since 1998 than they could have been said to have climbed over the same period if natural gas prices had remained low. If today's data were used, the ECOM model would estimate higher stranded costs because natural gas prices have fallen since the estimate made in the present proceedings. If tomorrow's data were used, the model would produce yet a different estimate. JUSTICE BRISTER charges that TXU is mitigating stranded costs it does not have, but the unquestioned fact is that stranded costs cannot be determined with any accuracy until one knows what the retail price of electricity is in a competitive market,

90. *Id. § 39.202.*

91. Tex. H.B. 2107, 77th Leg., R.S. (2001) (amending TEX. UTIL.CODE § 39.201(d), relating to the 2000–2001 proceedings, to add the following sentence: "If the commission determines that an electric utility that is subject to Section 39.254 and that has a service area exclusively located within the Electric Reliability Council of Texas does not have positive stranded costs based on a computation under Subsection (h), the commission shall order that mitigation attributable to positive differences identified under Section 39.257, ex-

cluding estimates of positive differences for calendar year 2001 and including mitigation attributable to excess earnings identified in accordance with transition plans approved by the commission, be applied such that 50 percent of such amounts allocable to residential customers, according to a methodology determined by the commission, shall be applied as a nonbypassable credit to the electric utility's residential customers in September 2001 as ordered by the commission.").

92. *Ante* at 147.

and no such market exists. The Legislature has required early mitigation of stranded costs not because those costs actually exist now but because it has been estimated that they will exist after the 2004 true-up and waiting until then to begin recovery threatens competition.

The second flaw in JUSTICE BRISTER's opinion, it seems to me, is that it assumes that it would be better for mitigation to be based on current data. However reasonable that proposition may sound, it was not adopted by the Legislature, and it cannot simply be assumed. The assumption that there is a better approach than the Legislature has chosen pervades JUSTICE BRISTER's opinion. He argues that there is no reason to deprive the Commission of current information in monitoring mitigation efforts, but there is: to minimize the risk of a large CTC in 2004, and to provide a stable environment for the commencement and development of competition. He argues that without a reversal of TXU's mitigation efforts, its TDU's charges will be "excessive", but that is true only relative to revised stranded cost estimates; relative to the 1998 estimates, TXU's mitigation efforts are precisely what the Legislature intended. JUSTICE BRISTER recognizes that his view would not only permit but encourage continued stranded cost estimates over the next two years but notes that the Commission has not claimed such authority. He does not appear to see, however, that the reason the Commission does not claim such authority is that constantly changing a TDU's rates could have a destabilizing effect on developing retail competition. He argues that the 2004 true-up may not determine stranded costs with much more accuracy; perhaps not, but the Legislature has expressly decided that stranded costs should be finally determined using market data in 2004. JUSTICE BRISTER concludes that the members of the Commission "may be wrong, but under any theory of legislative delegation, it is their mistake to make." [93] This is dangerously incorrect. Deregulation of the retail market for electricity, and how it is to be accomplished, are calls only the Legislature can make.

I do not know whether the Commission's approach in these proceedings is better than the one the Legislature has prescribed, but that is not for this Court to decide. The Commission's claim of power to reverse early mitigation efforts based on revised estimates of stranded costs is not unreasonable, but reasonableness is not the standard by which this Court must measure that claim. The power must either be expressly conferred by PURA or *necessarily* implied by its provisions. Because it is neither, I would hold that the Commission clearly abused its discretion.

### III

JUSTICE BRISTER is alone in arguing that the Commission has the power it claims here. CHIEF JUSTICE PHILLIPS's concurring opinion argues only that TXU has failed to show that relief by appeal is inadequate, the second requirement for obtaining mandamus relief.[94] In light of many previous cases in which we have granted mandamus relief, the inadequacy of an appellate remedy here is manifest.

Earlier this Term, in *Perry v. Del Rio,* the Court granted mandamus relief to determine which of two courts should proceed to trial on claims that Congressional districts in Texas should be reapportioned.[95] Each court had prepared its case

---

**93.** *Ante* at 150.

**94.** *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

**95.** 66 S.W.3d 239, 44 Tex. Sup.Ct. J. 1147 (Sept. 12, 2001).

for trial, both trial judges had cooperated to minimize conflicts in scheduling and the presentation of evidence, and the parties assured us that they were prepared to go to trial in both courts simultaneously. Had both cases proceeded to trial, it was possible that judgments could have been rendered in both and all appeals exhausted within the three weeks remaining before the federal court's deadline for deferring to state litigation. It was also possible that the federal court would grant a reasonable extension of its deadline, as it ultimately did, if the state litigation were nearing completion. Nevertheless, we concluded that one court should be mandamused not to proceed further because of the *threat* that simultaneous litigation posed to a timely end of the process. We explained it this way:

> We stated in *Walker v. Packer* that an appellate remedy is inadequate, justifying issuance of mandamus relief, " 'when parties stand to lose their substantial rights.' " In the current circumstances, further confusion or delay in the trial of the pending challenges to congressional districting poses the very real threat that the parties will not be able to obtain a decision in the state courts that is final on appeal before the October 1 deadline set by the federal courts. Although counsel assured us at oral argument that they and the two district courts involved have cooperated in an effort to conduct two trials of the same issues, we think the inefficiency of such an approach and the uncertainty that will attend two appeals and a final appeal to this Court pose an intolerable risk to completing the process within the limited time remaining. The Supreme Court has recognized that the right of a state's citizens to have districts drawn by state institutions is so substantial that federal courts must reasonably accommodate the state process and defer to a state solution. We believe that protection of this right necessitates the issuance of mandamus relief here.

> Furthermore, in *CSR Ltd. v. Link,* we recognized that exceptional circumstances may make a right of appeal inadequate. The circumstances presented here clearly fall within that category. The importance of achieving a decision of the districting claims that is final on appeal by the deadline set by the federal court and in time for review under the Voting Rights Act, all so as to minimize the risk of disruption to the impending election cycle, makes the issuance of mandamus relief not only appropriate but imperative.[96]

Proceeding in two courts simultaneously did not make it impossible or even improbable that the state system would produce a final decision by any federal court deadline; the duplicate proceedings only threatened compliance with the deadline.

By contrast, once competition begins, its development based on wholesale costs that have been wrongly set cannot be reversed. It may or may not be possible to reverse the harm done, but this threat seems to me to be exactly what we faced in *Perry*. CHIEF JUSTICE PHILLIPS's opinion dismisses *Perry* by saying that it involved proceedings in two trial courts while this involves proceedings in only one. This distinction has the same significance to the adequacy of an appellate remedy as the fact that the petitions in the two cases were filed in this Court on different dates—that is, none. Would mandamus relief be appropriate in this case only if appeals from the Commission's orders were pending in two different courts instead of one? No.

---

**96.** *Id.* at 258.

The competition genie cannot be forced back into his bottle once he has been released. In days retailers will begin to advertise, to promise customers rates based on their anticipations of what wholesale costs will be. The market will develop on the assumptions that the incumbent utilities' stranded costs were correctly estimated in 2001 rather than in 1998. If in 2004 the 2001 estimates are as far off as the Commission now thinks the 1998 estimates were, the adverse effects on competition will be exactly those predicted by the Commission in its 1998 report when it warned the Legislature to provide for early mitigation of estimated stranded costs.

CHIEF JUSTICE PHILLIPS correctly states that a party seeking mandamus relief must show a real danger of a permanent loss of substantive rights,[97] but he seems to equate this with some private pecuniary loss, and this, in my view, is the principal flaw in his opinion. Will TXU suffer financially from the Commission's ruling? No, the Commission says; we're really helping TXU. No thanks, says TXU. The Commission and TXU obviously do not see the future through the same crystal ball. But regardless of who turns out right, TXU is not required to show a financial loss to obtain mandamus relief. TXU has other substantive rights at stake, and what it argues it has lost by the Commission's reversal of mitigation is the plan prescribed by the Legislature, a plan that was devised after long study and negotiations among all interested parties. This is not the kind of loss that must simply be suffered quietly in hopes for the best, in hopes that the Commission is really trying to help TXU; TXU is entitled to seek to prevent its loss of promises made by the Legislature, even if it is impossible to show whether that loss will eventually harm it financially.

The impossibility of reliably forecasting the financial impact of the Commission's reversal of mitigation efforts is no reason to deny mandamus relief. Suppose the Commission were to decide that it would be better to commence competition a year from now,[98] despite the Legislature's clear mandate that it commence on January 1, 2002. Would consumers or incumbent utilities or prospective retailers be helped or hurt by such a decision, and thus be entitled to challenge it by mandamus? Assuming, which would be likely, that no one in such a case could prove harm one way or the other with any certainty, is there any doubt that mandamus would lie to prevent the Commission from substituting its judgments for the Legislature's on such a fundamental issue? CHIEF JUSTICE PHILLIPS's concurring opinion states that "on this record, [it] cannot [be] determine[d] that irreparable harm will befall TXU if we do not act."[99] Even assuming that this is true in some economic sense, the statement sidesteps the principal issue and TXU's main argument, which is that TXU, as well as the other parties to this proceeding, other utilities, prospective retailers, and Texas consumers, are all entitled to the plan the Legislature has prescribed and not some other plan, even if it turned out to be a better one. Fundamentally, whether an appeal is adequate in these circumstances does not depend on whether TXU's ox ends up being gored, but on whether everyone is deprived of the transition plan mandated by the Legislature.

CHIEF JUSTICE PHILLIPS's opinion argues that a decision on mandamus relief cannot be made "on this record". But the factual considerations related to whether the re-

---

97. *Ante* at 132.

98. *See* TEX. UTIL.CODE § 39.103.

99. *Ante* at 135.

versal of mitigation efforts will be harmful or helpful have been thoroughly explored before the Commission. It is highly unlikely that the district court would be justified in hearing additional evidence on this score.[100] No more thorough record than the one we have before us, developed over eighteen months of intense debate in multiple proceedings, could possibly be presented in the district court, even if the court were permitted to go beyond the agency record, and it clearly is not.[101] For this reason, the fact that the district court is authorized to stay the Commission's order[102] does not warrant denial of mandamus relief. It does not appear that anything can be gained from simply shuffling the matter off to the district court, and by whatever route the issue of the validity of the Commission's order comes to us, we must eventually decide it. To delay that decision while the district court determines whether to grant a stay and the court of appeals and this Court review that determination threatens the irreparable harm— either to TXU, or its competition, or the public—that a competitive market will have begun to evolve in ways contrary to the Legislature's plan. The imminent commencement of competition counsels an immediate decision rather than one that might otherwise be delayed.

CHIEF JUSTICE PHILLIPS argues that mandamus relief should not be used merely to correct the misconstruction of a statute. There are two answers. First, this case does not involve mere statutory misconstruction. The Commission and the Legislature plainly believed that early mitigation of stranded costs was essential to deregulation. A retreat from that position now is a fundamental departure from the Legislature's deregulation scheme. Second, CHIEF JUSTICE PHILLIPS's argument ignores precedent. This Court often uses mandamus to prevent disclosure of privileged documents.[103] Which is more readily correctable on appeal: a discovery dispute between private parties, or deregulation of electric utilities involving millions of Texans? In *Travelers Indemnity Co. v. Mayfield*, we mandamused a trial court to vacate its order requiring the carrier in a workers' compensation case to reimburse the plaintiff's attorney fees periodically throughout the litigation, holding that the order "radically skewed the dynamics of the case".[104] Which is more readily correctable on appeal: an award of several hundred dollars in attorney fees, as in *Travelers*, or a reversal in $1.6 billion stranded cost mitigation, as in this case? In *CSR Limited v. Link*[105] and *In re Masonite*,[106] we mandamused trial courts to vacate rulings on special appearances and venue, respectively, that could have affected thousands of other parties in hundreds of other cases. Which is more readily correctable on appeal: rulings involving

**100.** *See Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 571 S.W.2d 503 (Tex.1978) (approving trial court's decision to determine utility's request to stay the Commission's order based on the agency record, excluding new evidence on confiscation); *Public Util. Comm'n v. Water Servs., Inc.*, 709 S.W.2d 765 (Tex.App.-Austin 1986, writ dism'd) (affirming admission, in a temporary injunction hearing, of evidence on irreparable harm and the bond's adequacy, but noting that only the evidence in the agency record would be relevant to the issue of probability of success on the merits).

**101.** *Id.*

**102.** TEX. UTIL.CODE § 15.004.

**103.** *See, e.g., Walker v. Packer*, 827 S.W.2d 833 (Tex.1992).

**104.** 923 S.W.2d 590, 595 (Tex.1996).

**105.** 925 S.W.2d 591 (Tex.1996).

**106.** 997 S.W.2d 194 (Tex.1999).

hundreds or thousands of private litigants, as in those cases, or rulings involving millions of Texas consumers, as in the present case? In *In re University Interscholastic League*,[107] we mandamused a trial court to vacate an injunction prohibiting the League from disqualifying Robstown High School from participating in the state baseball tournament then in progress. Which is more readily correctable on appeal: standings in a state baseball tournament, or the development of a deregulated electric industry? No rational jurisprudence would put the important but limited consequences of discovery disputes, special appearances, venue, and baseball tournaments ahead of the enormous consequence of electric deregulation.

CHIEF JUSTICE PHILLIPS's answer to these cases is that they all involved trial court rulings while here the district court has not yet ruled, but this distinction is wholly irrelevant. CHIEF JUSTICE PHILLIPS does not disagree that the Court can mandamus the Commission in an original proceeding without a ruling from the district court. We disagree not over *whether* but *when* exigency justifies action by this Court without awaiting proceedings in the lower courts. The cited cases illustrate what the Court has considered in the past to be exigent circumstances. A state baseball tournament qualifies.[108] So should electric deregulation.

CHIEF JUSTICE PHILLIPS's concurring opinion makes two other arguments that are wholly lacking in merit. One argument is no more than a suggestion that TXU should be denied mandmaus relief because it did not ask for expedited consideration of its mandamus petition. The

Court did not need a motion to tell it that time was of the essence; it was obvious to us all that TXU's petition required an expedited consideration, witness the accelerated briefing and argument schedule, and these hurried opinions. Furthermore, the suggestion that a motion to expedite would have been important is belied by the Court's denial today of Reliant Energy's petition for mandamus; Reliant did file a motion to expedite, which the Court refused to grant. CHIEF JUSTICE PHILLIPS's answer to Reliant's motion is that it was faulty because it did not state a specific date by which the Court should act.[109] Again, Reliant and TXU may justifiably have thought that the Court would realize from their arguments that it was important to have a ruling on the merits by January 1, 2002, or as soon afterward as possible. I suspect it will come as a surprise to Reliant's counsel that its motion was denied for lack of a specific date. The other argument in CHIEF JUSTICE PHILLIPS's concurring opinion against mandamus relief is that the Legislature provided for expedited review of issues when it thought haste was necessary,[110] and reversal of mitigation efforts was not one of those issues. The answer to this argument is simple: the Legislature provided for expedited review of issues it thought would be controversial; having no more idea that the Commission would attempt to reverse mitigation efforts than that the Commission would delay commencement of competition[111] or deny recovery of stranded costs, the Legislature never imagined that there would ever be any reason to appeal on such issues, let alone the necessity for an expedited appeal. We cannot justifi-

---

**107.** 20 S.W.3d 690 (Tex.2000).

**108.** *Id.* at 692.

**109.** *Ante* at 135 n. 1.

**110.** TEX. UTIL.CODE § 39.303(f); *see City of Corpus Christi,* 51 S.W.3d at 235.

**111.** *See* TEX. UTIL.CODE § 39.103.

ably say to the Legislature: never having imagined the worst, you're stuck with it.

Perhaps it was important enough for Robstown High School to be excluded from the state baseball playoffs that this Court grant extraordinary mandamus relief; it is often important enough to issue mandamus relief to protect private parties' legitimate claims of privilege; mandamus relief is m certainly warranted when necessary to protect the rights of hundreds and thousands of litigants; it was necessary to prevent distorting workers' compensation litigation although only a few hundreds or thousands of dollars were involved; and mandamus relief is rightly granted to help assure a successful end to redistricting proceedings. But if all of this is true, and I think it is, then I do not see any colorable reason for denying relief in a case of the extraordinary magnitude of this one.

Consistent with the Court's many precedents, I would grant mandamus relief in this case.

<div align="center">*   *   *   *   *   *</div>

In all likelihood, we have not seen the last of this case. Back it goes to the district court, from whence from the granting or denial of a stay it will bounce on appeal to the court of appeals and this Court, and then on appeal from the affirmance or reversal of the Commission's decision, up and down again, until the private parties, and the taxpayers, have multiplied their investments in obtaining a simple yes-or-no answer. Incipiant ludi! Mindless of this waste, the Court bids the parties return another day and another day, raising the same issues, making the same arguments, until finally they are given the only answer they ever wanted—can the Commission reverse mitigation or not—on

which the Court has long since made up its mind. The process thus more closely resembles a game of "mother, may I", than anything that could remotely be called jurisprudence.

It is always important for issues to be fully developed factually and legally before a final resolution by the ultimate arbiter. But here they have been. The Court has an answer for the parties, and it is irresponsible not to deliver it.

In *Perry* we reiterated that "[c]ourts are erected to settle controversies, not to multiply them." [112] We followed that imperative in *Perry;* here we do not.

</div>

---

112. *Perry v. Del Rio,* 66 S.W.3d 239, 258, 44 Tex. Sup.Ct. J. 1147, 1159 (Sept. 12, 2001)

(quoting *Cleveland v. Ward,* 116 Tex. 1, 285 S.W. 1063, 1071 (1926)).